429 A.2d 1342 (1981)
GEORGE WASHINGTON UNIVERSITY, Petitioner,
v.
DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent, Sidney Margolis, Intervenor.
No. 80-779.
District of Columbia Court of Appeals.
Argued January 21, 1981.
Decided April 1, 1981.
*1343 Iverson O. Mitchell, III, Washington, D.C., with whom Norman M. Glasgow, Washington, D.C., was on the brief, for petitioner.
David P. Sutton, Acting Deputy Corp. Counsel, and Leo N. Gorman, Asst. Corp. Counsel, Washington, D.C., for respondent, adopting the brief of intervenor Margolis.
Harley J. Daniels, Washington, D.C., with whom Steven M. Roth, Washington, D.C., was on the brief, for intervenor.
Jonathan Katz, David Boxer, Mark Holzberg, and Mark Engel, pro se, amici curiae.
Before NEWMAN, Chief Judge, FERREN, Associate Judge, and GALLAGHER, Associate Judge, Retired.[*]
FERREN, Associate Judge:
This case presents two principal questions: (1) whether the Board of Zoning Adjustment (BZA or the Board) properly concluded that intervenor has not abandoned his right to nonconforming use of his property, and (2) whether the Board erred in failing to take specific account of the effect of the proposed change in nonconforming use from a clothing store to a restaurant on the campus plan of George *1344 Washington University (GWU or the University). Petitioner contests numerous other findings and conclusions of the Board. Finding no merit in any of these contentions, we affirm.

I.
For three generations, from 1901 to 1978, the Margolis Family Clothing Store occupied the first floor of the property at 2145 G Street, N.W., Washington, D.C. The second floor was used for residential purposes. In 1958, the zoning of the area changed from C-1, which permits "neighborhood shopping," to R-5-C, a "residence" district of "medium-high density." D.C. Zoning Regs. §§ 2101.11, -.14 (1958 with amendments through Oct. 1, 1980) (D.C. Zoning Regs.)[1] The Margolis' haberdashery and tailoring shop remained as a nonconforming use on the first floor.
In 1970, the District of Columbia Board of Zoning Adjustment approved a campus plan for the George Washington University in accordance with D.C. Zoning Regs. § 3101.46. The plan included 2145 G Street, N.W., within its bounds but indicated no immediate intentions for that portion of that block.
In 1977, Sidney Margolis, intervenor in the present case, sought to retire from the family business. He applied to the BZA for permission to convert the property to restaurant use, which would have been permitted as a matter of right in the C-1 zone that previously governed the property. The Board denied the application because of an inadequate record. On rehearing, on October 11, 1977, the Board granted an amended application for a restaurant on the first floor with a 76-person seating capacity. The Board also authorized use of the second floor for related office, storage, and toilet facilities "as ... no structural alterations will be made." The University filed a petition for review in this court. Although intervenor had planned to lease the restaurant to Armand's Chicago Pizzeria at the time of the BZA proceeding, some time after approval of the application he entered into an agreement with a new lessee, represented by local restaurateur Dominique D'Ermo, to operate a restaurant with generally the same capacity and layout that the Board had approved for Armand's. Intervenor then vacated the property, and the new lessee took possession, obtained building permits, gutted the building, and began reconstruction.
On November 14, 1978, after argument on the University's petition for review of the Board's grant of the application, this court denied the District's motion to remand the record for further administrative proceedings to consider the plans of the new lessee, accepted the University's suggestion of mootness, and dismissed the petition "as moot ... without prejudice to the Board's expediting any further proceedings in respect to this property by Mr. Margolis (the property owner) in any way it may deem reasonable." See George Washington University v. District of Columbia Board of Zoning Adjustment, D.C.App. (No. 12930, Nov. 14, 1978) (per curiam). Shortly thereafter, the District of Columbia building department, which had previously stopped construction for a short time in order to require restoration with wood rather than steel joists, halted the work altogether.
Thirteen months later, on December 18, 1979, intervenor Margolis filed a second application with the BZA, which is the subject of the present petition for review. This application once again requested permission to change and extend the nonconforming use, pursuant to D.C. Zoning Regs. §§ 7104.2 and 7105.2, by means of a "special exception." Id. § 8207.2. Specifically, intervenor sought to change the nonconforming use of the first floor (a men's clothing and tailoring store) to another nonconforming use (a 76-person restaurant), as well as to extend the new nonconforming use to the second floor for related storage and toilet facilities.
*1345 On March 19, 1980, the Board held a hearing on this application. On April 2, 1980, the Board granted the application on specified conditions and, on June 27, 1980, followed with its written findings of fact and conclusions of law. The University filed a timely petition for review of the Board's decision. See D.C.Code 1973, §§ 11-722, 17-303; id. 1978 Supp., § 1-1510; D.C.App. R. 15. Margolis intervened. See id. 15(g).

II.
Petitioner argued that intervenor had lost his right to a nonconforming use through "abandonment." The Board disagreed. We hold the Board's conclusion that intervenor had not abandoned his nonconforming use is supported by appropriate findings of fact and substantial evidence of record.
A nonconforming use is an exception to generally applicable zoning requirements for a previously lawful, existing use. See D.C.Code 1973, § 5-419; D.C. Zoning Regs. §§ 7101-10. See generally 1 R. Anderson, American Law of Zoning 2d §§ 6.01-.73 (1976 & Supp.1980); 3 A. Rathkopf, The Law of Zoning and Planning, 58-1 to 62-18 (4th ed. 1980 & Supp.1980). The government recognizes nonconforming uses in derogation of the general zoning scheme in order to protect the interests of property owners. Wood v. District of Columbia, D.C.Mun.App., 39 A.2d 67, 69 (1944); 1 R. Anderson, supra §§ 6.02-.07; 3 A. Rathkopf, supra at 58-1 to -3, 61-1. If, however, an owner evidences his rejection of that protection by discontinuing a nonconforming use, he "abandons" his right to that exemption and thereafter must comply with general zoning requirements. See Wood, supra at 68-69; 1 R. Anderson, supra §§ 6.60-.63; 3 A. Rathkopf, supra at 61-1 to -24. To establish abandonment, one must demonstrate "(1) the intent to abandon and (2) some overt act or failure to act which carries the implication of abandonment." Wood, supra at 68 (footnote omitted); 1 R. Anderson, supra § 6.60, at 495.
In the present case, the Board stated that "whatever physical changes were made to the building were deliberately made to convert the building to a new nonconforming use, as a restaurant, as approved by the Board. The Board concludes that the nonconforming use has not been abandoned, and that the application is properly before the Board under Sub-section 7104.2."
Our scope of review is familiar. We must determine (1) whether the agency has made a finding of fact on each material contested issue of fact; (2) whether substantial evidence of record supports each finding; and (3) whether the conclusions of law follow rationally from the findings. Monaco v. District of Columbia Board of Zoning Adjustment, D.C.App., 409 A.2d 1067, 1070 (1979); Citizens Association of Georgetown, Inc. v. District of Columbia Zoning Commission, D.C.App., 402 A.2d 36, 41-42 (1979); see D.C.Code 1978 Supp., §§ 1-1509(e), -1510(3)(A), (E).
Petitioner contends that the Board failed to make any finding of fact supporting its conclusion on the issue of abandonment. Furthermore, petitioner asserts, the record contains substantial evidence of abandonment, principally (1) intervenor's voluntary change from one nonconforming use to another, (2) the related physical changes in the building, and (3) intervenor's 13-month delay in filing his second application. Accordingly, petitioner argues, the Board's conclusion that intervenor had not abandoned his prior nonconforming use is clearly erroneous. It would follow that because intervenor had lost his right to nonconforming use of the property, he could convert it to restaurant use only by meeting the more stringent standard for a "use variance." See Palmer v. Board of Zoning Adjustment, D.C.App., 287 A.2d 535, 541-42 (1972); D.C. Code 1973, § 5-420(3); D.C. Zoning Regs. § 8207.1.
Contrary to petitioner's contention, the Board did make findings of fact central *1346 to the question of abandonment. The Board found that it had granted intervenor a special exception for restaurant use on October 20, 1977 (Finding 4), that this court had dismissed, without prejudice, the petition for review of that decision as moot on November 14, 1978 (Finding 5), and that intervenor had then sought once again to change the use of the property by leasing it to restauranteur D'Ermo (Finding 10). The Board further found that intervenor had "proceeded with the proposed plans for a restaurant based on the approval of the Board ...." (Finding 9).
Substantial evidence of record supports these findings. The record contains a copy of the Board's order of October 20, 1977, this court's decision of November 14, 1978, and intervenor's renewed application of December 18, 1979. Intervenor, the structural engineer for the project, and the architect testified that after the Board had given its original approval, they had obtained the necessary permits and begun the physical conversion of the building to restaurant use until the District government halted reconstruction in late 1978 or early 1979.
The Board's findings rationally lead to its conclusion that intervenor had not abandoned his right to nonconforming use of this property. Petitioner's first argument to the contrary  the change from one nonconforming use to another  actually cuts in intervenor's favor. In addition to recognizing nonconforming uses, District zoning law expressly authorizes "the extension of any such nonconforming use throughout the building and ... the substitution of nonconforming uses." D.C.Code 1973, § 5-419. See generally 1 R. Anderson, supra §§ 6.33-.52; 3 A. Rathkopf, supra at 59-1 to 60-8.[2] Pursuant to this statutory authorization, the Zoning Commission has adopted regulations allowing for such changes with BZA approval. See D.C. Zoning Regs. § 7104.05. As to petitioner's first argument, therefore, we cannot say that a change from one nonconforming use to another pursuant to BZA approval establishes either the overt act or the intent necessary to make out an abandonment. To the contrary, an application for such a change indicates the intent to maintain nonconforming status.[3]
Similarly, in response to petitioner's second argument, reconstruction to accommodate a new nonconforming use pursuant to BZA approval manifests an intent to preserve  not give up  nonconforming use.[4] Intervenor received BZA approval on October 11, 1977, to convert his property to *1347 use as a restaurant with a 76-person seating capacity. The Board also permitted extension of the nonconforming use to the second floor for related toilet and storage facilities, specifically on the ground that "no structural alterations will be made." Given this BZA approval, intervenor's present lessee obtained building permits and began work on the building. Because, absent a contrary statute, the right to a nonconforming use generally runs with the land, 1 R. Anderson, supra § 6.37; 3 A. Rathkopf, supra at 58-8; see Amos v. Cummings, D.C.Mun. App., 67 A.2d 687, 689 (1949), neither intervenor nor his present lessee had reason at that time to believe that only the prior lessee (Armand's) could convert the property in accordance with the Board's October 11 order. Moreover, the District itself endorsed that view by issuing building permits to the new lessee. Although this court subsequently held, in effect, that the Board's approval applied only to Armand's, see George Washington University, supra,[5] the intervenor and his lessee appear to have proceeded to prepare for restaurant use in justifiable reliance on the Board's approval of the special exception. See District of Columbia v. Cahill, 60 U.S.App.D.C. 342, 343, 54 F.2d 453, 454 (1931). The Board was therefore warranted in concluding that intervenor had not abandoned his prior nonconforming use of the basis of physical changes in the building by his present lessee.
Neither the modification nor the cessation of renovation pursuant to D.C. building department orders compels a contrary conclusion. The building department did require a change in the reconstruction plans (replacement of the old wood joists with wood rather than steel joists); and shortly after this court's decision in George Washington University, supra, the government halted reconstruction altogether. Obedience to government orders, however, is not an act indicative of an intent to abandon a nonconforming use. See 1 R. Anderson, supra § 6.61, at 498-99; 3 A. Rathkopf, supra at 61-3, -9.
As to petitioner's third argument, intervenor's failure to file a new application for 13 months after this court dismissed the first petition for review does not compel an inference of abandonment. In the District, unlike some other jurisdictions, the mere lapse of time without active pursuit of a nonconforming use does not deprive the owner of that right. Wood, supra at 68. See generally 1 R. Anderson, supra §§ 6.60, .63; 3 A. Rathkopf, supra at 61-3, -10 to -12.
Finally, even taking all these facts together, we see a rational connection between the Board's findings and its conclusion that intervenor had not abandoned his nonconforming use. Because he was closing up the clothing and tailoring business, intervenor was attempting to follow a lawful procedure to keep his property productive by changing its use. To hold that his efforts resulted in abandonment of his right to a nonconforming use would make a mockery of the statutory scheme permitting substitution of nonconforming uses.[6]

III.
Petitioner's second principal contention is that the Board erred as a matter of law in *1348 failing specifically to consider the effect of the change in the nonconforming use of 2145 G Street, N.W., on the University's approved campus plan. Petitioner maintains that the criteria established to control the Board's exercise of discretion to grant changes and extensions of nonconforming uses, see D.C. Zoning Regs. § 7109, require the Board to take specific account of the effect of any such change on the campus plan. Petitioner lays particular emphasis on the requirement of § 7109.112: "The Board shall first find in each case that: ... The nonconforming use would not affect adversely the present character or future development of the neighborhood in accordance with these regulations and the Comprehensive Plan for the District of Columbia ...." (Emphasis omitted.)
Intervenor responds that the campus plan does not control the use of private property located within the campus boundaries but owned by others than the University. Alternatively, intervenor asserts that the record would support a conclusion that the proposed restaurant use is compatible with the campus plan.
We agree with intervenor's first response. We hold that in considering changes or extensions of nonconforming uses under D.C. Zoning Regs. §§ 7104-05, 7109, the Board need not make a specific finding or reach a specific conclusion as to how the change or extension would affect a university campus plan approved in accordance with D.C. Zoning Regs. § 3101.46.
The relationship between § 7109 and § 3101.46 is a question of law, which this court has "the power ... to decide ...." D.C.Code 1978 Supp., § 1-1510. In doing so, however, we must give due consideration to the administrative agency's interpretation of its substantive regulation and will uphold that interpretation "`unless it is plainly erroneous or inconsistent with the regulation.'" Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). Although the Zoning Commission adopts zoning regulations, see D.C.Code 1973, § 5-413, the BZA is empowered to grant special exceptions for change and extension of nonconforming uses, see id. §§ 5-419, -420; D.C. Zoning Regs. §§ 7104-05, 7109, 8207.2, and is charged with approving campus plans. See id. §§ 3101.463, .465. We give the same weight to the Board's interpretation of these provisions. See Sheridan-Kalorama Neighborhood Council v. District of Columbia Board of Zoning Adjustment, D.C.App., 411 A.2d 959, 961-62 (1979); Dietrich v. District of Columbia Board of Zoning Adjustment, D.C.App., 320 A.2d 282, 286 (1974); Taylor v. District of Columbia Board of Zoning Adjustment, D.C.App., 308 A.2d 230, 232 (1973).
On this issue, the Board concluded that "the Campus plan approved by the Board for George Washington University is binding upon the University for property owned by the University. The Board concludes that the campus plan is not and cannot be binding upon privately owned property within the plan area." This conclusion is not "plainly erroneous or inconsistent with the regulations." Dietrich, supra at 286; accord, Lenkin v. District of Columbia, Board of Zoning Adjustment, D.C.App., 428 A.2d 356, 358 (1981); Sheridan-Kalorama, supra at 961; Taylor, supra at 232.
Under D.C. Zoning Regs. § 3101.4, a college or university is permitted in a residential district subject to BZA approval. The regulations restrict the permissible location and bulk of university buildings. See id. §§ 3101.461-.462. Each college and university must submit to the Board for approval "a plan for developing the campus as a whole." Id. § 3101.463; see id. § 3101.465. The purpose of these regulations is "to prevent unreasonable campus expansion into improved low-density districts." Id. § 3101.462 (emphasis omitted). The thrust of the regulations, then, is not to affect the use of private property located within campus *1349 boundaries, but to keep universities from expanding into residential neighborhoods without control.
Petitioner maintains that it "does not seek to make the campus plan binding upon privately owned property within the plan area," but only to establish that the Board is "required to consider the [e]ffect of the change and extension of the non-conforming use on the campus plan ...." Petitioner, however, would make the campus plan determinative in the following sense: if the Board were to find that a change from one nonconforming use to another was inconsistent with the campus plan, it would be compelled to find that the change would "affect adversely the present character or future development of the neighborhood." Id. § 7109.112. Consequently, the Board would lack discretion to permit the change.
Petitioner's theory thus presents a distinction without a difference. To accept that view in effect would require the development of all private property within campus plan boundaries to conform to the campus plan. This position would permit the university to achieve indirectly what it cannot obtain directly  application of the campus plan to the private property of others. Such an approach would extend these zoning regulations beyond their intended reach. It would arbitrarily deprive owners of nonconforming private property within the campus boundaries of their right to change and extend their nonconforming uses. See D.C.Code 1973, § 5-419; D.C. Zoning Regs. §§ 7104-05.[7] We decline to force such an interpretation on the Board.
Petitioner is not prejudiced by this result. The generally applicable provisions of D.C. Zoning Regs. § 7109 protect the interests of the University, just as they guard others in the neighborhood of a nonconforming use. The Board fully complied with its obligations under this section to consider the local impact of the proposed conversion to restaurant use. See Citizens Association of Georgetown, Inc., supra. In particular, in accordance with D.C. Zoning Regs. §§ 7109.-111-.112, the Board concluded that "the proposed use will be a neighborhood facility" and that "the proposed restaurant use will not have an adverse effect on surrounding and nearby properties ...." These conclusions were supported by the Board's findings regarding the nature of both the neighborhood (Findings 6-7) and the proposed restaurant operation (Findings 10-17), and by the recommendation of the Advisory Neighborhood Commission (Findings 18, 20). These findings, in turn, were based on record evidence provided by intervenor, prospective restaurant manager D'Ermo, intervenor's traffic expert, the Advisory Neighborhood Commission, and a GWU student representative. Although the University, the West End Citizen's Association, and several individual neighbors opposed the change, the record contains ample evidence to support the Board's findings and conclusions.[8]

IV.
In summary, we conclude, first, that when, as here, substantial evidence supports *1350 the Board's finding that, pursuant to earlier Board authorization, a property owner has undertaken a change from one nonconforming use to another and made related physical alterations in the building, the Board reasonably may conclude that the owner has not abandoned the nonconforming use. Second, in considering an application for change and/or extension of a nonconforming use of non-university property located within a campus plan area, the Board need only comply with the general requirements of D.C. Zoning Regs. §§ 7104-05, 7109; it need not make a specific finding or reach a specific conclusion regarding the effect of the change on the university campus plan. Accordingly, the decision of the Board of Zoning Adjustment is
Affirmed.

APPENDIX
The statute governing nonconforming uses in the District of Columbia is D.C.Code 1973, § 5-419:
The lawful use of a building or premises as existing and lawful at the time of the original adoption of any regulation heretofore adopted under the authority of section 5-412, or, in the case of any regulation adopted after June 20, 1938, under sections 5-413 to 5-428, at the time of such adoption, may be continued although such use does not conform with the provisions of such regulation, provided no structural alteration, except such as may be required by law or regulation, or no enlargement is made or no new building is erected. The Zoning Commission may in its discretion provide, upon such terms and conditions as may be set forth in the regulations, for the extension of any such nonconforming use throughout the building and for the substitution of nonconforming uses.
The following zoning regulations, cited in the preceding opinion, are pertinent to the decision. All zoning regulations are reproduced from D.C. Zoning Regs. (1958 with amendments through Oct. 1, 1980). Emphasis of terms defined in D.C. Zoning Regs. § 1202 is in the original.
SECTION 1202  DEFINITIONS
. . . .
Alterations, structural: any change in the permanent physical members of a building or other structure, such as bearing walls or partitions, columns, joists, rafters, beams, or girders.

* * * * * *
2101.1 For the purpose of these regulations, the District of Columbia is hereby divided into the following districts:
2101.11 Residence Districts
. . . .
R-5-C Medium-high density
. . . .
2101.14 Commercial District
C-1 Neighborhood Shopping
. . . .
* * * * * *
3101.4 The following uses are permitted if approved by the Board of Zoning Adjustment subject to the conditions specified in Section 8207 and below in each case:
. . . .
3101.46 College or university which is an academic institution of higher learning, *1351 including college or university hospital, dormitory, fraternity or sorority house proposed to be located on the campus of a college or university, provided that:
3101.461 Such use is so located that it is not likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions:
3101.462 In R-1, R-2, R-3, R-4, R-5-A and R-5-B Districts the maximum bulk requirements normally applicable in such districts may be increased for specific buildings or structures provided the total bulk of all buildings and structures on the campus shall not exceed the gross floor area prescribed for the R-5-B District. In all other residential districts similar bulk increases may also be permitted provided the total bulk of all buildings and structures on the campus shall not exceed the gross floor area prescribed for the R-5-C District. Because of permissive increases as applicable to normal bulk requirements in the low-density districts regulated hereunder, it is the intent of this subparagraph to prevent unreasonable campus expansion into improved low-density districts.

3101.463 The applicant shall submit to the Board a plan for developing the campus as a whole, showing the location, height, and bulk, where appropriate, of all present and proposed improvements, including, but not limited to buildings, parking and loading facilities, screening, signs, streets, and public utility facilities, athletic and other recreational facilities, and a description of all activities conducted or to be conducted therein, and of the capacity of all present and proposed campus development; and,
3101.464 Within a reasonable distance of the college or university campus and subject to compliance with the provisions of sub-paragraph 3101.461 hereof and subsection 8207.2 the Board may also permit the interim use of land or improved property with any use which the Board may determine is a proper college or university function; and, 3101.465 Before taking final action on an application for such use, the Board shall have submitted the application to the District of Columbia Municipal Planning Office and the District of Columbia Department of Transportation for review and report.
* * * * * *
6101.6 All uses established in a C-M District under authority of sub-paragraph 6101.34 and uses accessory thereto shall be operated so as to comply with the following standards of external effects:
6101.61 The volume of sound inherently and recurrently generated shall not exceed the standards as set forth below at any point along the boundaries of the district in which such use is located:
6101.611 Sound levels shall be measured with a sound level meter and associated octave band filter manufactured according to standards prescribed by the American Standards Association on the effective date of these regulations;
6101.612 Objectionable sounds of intermittent nature shall be controlled so as not to become a nuisance to adjacent uses; and,
6101.613 Maximum sound pressure levels shall not exceed those set forth in the following table, except that where a C-M District abuts and M District, the standards set forth in paragraph 6102.61 shall apply along the boundary separating the C-M and M Districts:

 Maximum sound pressure
Octave band level in decibels
 in cycles (0.0002 dynes per
per second square contimeter)
----------- -----------------------
 0-74 72
 75-149 67
 150-299 59
 300-599 52
 600-1,199 46
 1,200-2,399 40
 2,400-4,800 34
 Above 4,800 32

*1352 6101.62 The emission of any smoke from any source whatever to a density greater than that density described as No. 2 on the Ringleman Chart is prohibited. The Ringleman Chart, as published and used by the Bureau of Mines, United States Department of the Interior, is hereby adopted and made a part of these regulations.
6101.63 The emission of any odorous gases or other odorous matter or steam in such quantities as to be offensive or noisome at any point along the boundaries of the district in which the use is located is prohibited.
6101.64 No noxious, toxic, or corrosive fumes or gases shall be permitted to escape or be discharged from any use permitted in a C-M District.
6101.65 No objectionable amounts of cinders, dust, or fly-ash shall be permitted to escape or be discharged from any use permitted in a C-M District.
6101.66 No direct or reflected glare or heat from any source shall be detectable in objectionable amounts beyond the boundaries of the district in which the use is located.
6101.67 Every use shall be so operated that the ground vibration inherently and recurrently generated is not perceptible, without instruments, at any point along any boundary of the district in which the use is located.
* * * * * *
7103.2 The following classes of nonconforming uses of structures or of land are hereby established:
7301.21 Class I: Any nonconforming use of land.
7103.22 Class II: All other nonconforming uses.

* * * * * *
7104.2 If approved by the Board of Zoning Adjustment in accordance with the authority and procedures established in Section 7109 of this Article a Class II nonconforming use may be changed to a use which is permitted in the most restrictive district in which the existing nonconforming use is permitted.

* * * * * *
7105.2 If approved by the Board of Zoning Adjustment in accordance with the authority and procedures established in Section 7109 of this Article a Class II nonconforming use may be extended to other portions of a structure devoted to such use, provided no structural alterations are made and no other structure is involved in the extension of the nonconforming use.

* * * * * *
7106.1 Ordinary repairs, alterations, or modernizations may be made to a:
7106.11 Conforming structure or portion thereof devoted to a nonconforming use provided:
7106.111 No structural alterations are made thereto except those required by other municipal law regulations; and,
7106.112 The nonconforming use is not extended except in accordance with Section 7105.
* * * * * *

SECTION 7107  ENLARGEMENT OF STRUCTURES
7107.1 No structure devoted to a nonconforming use may be enlarged, nor may a new structure be erected to house a nonconforming use.

* * * * * *
7109.1 In exercising the authority granted under Sections 7104 and 7105 of this Article, the Board of Zoning Adjustment shall be controlled by the provisions of the following subparagraphs.
7109.11 The Board shall first find in each case that:
7109.111 Either the new use or extension will be:
7109.1111 A neighborhood facility; or,
7109.1112 The type of use which although not a neighborhood facility will not be objectionable.

*1353 7109.112 The nonconforming use would not affect adversely the present character or future development of the neighborhood in accordance with these regulations and the Comprehensive Plan for the District of Columbia; and, 7109.113 In the case of a commercial or an industrial nonconforming use located in a Residence District, any order of the Board shall be conditioned upon the future conduct of the use in accordance with the standards of external effects established for a C-M District in Sub-section 6101.6 provided that the point of measurement of such effects shall be at the lot line.

7109.12 The Board shall also give consideration to:
7109.121 The general character of uses and structures existing within not less than 300 feet in all directions of the nonconforming use;

7109.122 The arrangement, design, or architectural features of all existing and proposed structures;

7109.123 The type, nature of illumination, and design of any signs;
7109.124 The amount of noise, traffic, vibration, or any other deleterious external effect which the nonconforming use can reasonably be anticipated to generate or create;
7109.125 The nature of any protective screening, device, or other safeguard designed to shield the neighborhood from any adverse effect; and
7109.126 The amount of parking or loading facilities provided.
7109.13 The Board may require such changes, modifications, or amendments in any design, plans, screening, type of lighting, nature of any sign, circulation facilities, hours of operation, or any other restriction or safeguard it may deem necessary to protect the value, utilization, or enjoyment of property in the neighborhood.
* * * * * *
8207.11 Where, by reason of exceptional narrowness, shallowness or shape of a specific piece of property at the time of the original adoption of the regulations or by reason of exceptional topographical conditions or other extraordinary or exceptional situation or condition of a specific piece of property, the strict application of any regulation adopted under this Act would result in peculiar and exceptional practical difficulties to or exceptional and undue hardship upon the owner of such property, to authorize, upon an appeal relating to such property, a variance from such strict application so as to relieve such difficulties or hardship, provided such relief can be granted without substantial detriment to the public good and without substantially impairing the intent, purpose, and integrity of the zone plan as embodied in the zoning regulations and map.

* * * * * *
8207.2 Pursuant to authority contained in the Zoning Act of June 20, 1938 (52 Stat. 797), as amended, the Board is authorized to grant special exceptions as provided in the proceeding Articles of these regulations where in the judgement of the Board such special exceptionals will be in harmony with the general purpose and intent of the zoning regulations and maps and will not tend to affect adversely the use of neighboring property in accordance with said zoning regulations and maps, subject in each case to the special conditions specified in said Articles....
NOTES
[*] Judge Gallagher was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on February 27, 1981.
[1] The statute and pertinent regulations are reproduced in an appendix to this opinion.
[2] But cf. Lenkin v. D.C. Bd. of Zoning Adjustment, D.C.App., 428 A.2d 356, 360 (1981) (upholding application of D.C. Zoning Regs. § 7107.1, precluding enlargement of nonconforming structures absent a variance).
[3] Compare Town of Darien v. Webb, 115 Conn. 581, 587, 162 A. 690, 692 (1932) (change from nonconforming use as restaurant to conforming use as residence resulted in abandonment); Stieff v. Collins, 237 Md. 601, 606-07, 207 A.2d 489, 497 (1965) (discontinuance of nonconforming use as dairy and bakery without substitution of new nonconforming use resulted in abandonment); Huntley Estates, Inc. v. Town of Eastchester, 121 N.Y.S.2d 504, 511 (Sup.Ct. 1953) (unauthorized substitution of new nonconforming use as offices and warehouse for old nonconforming use as bar and restaurant resulted in abandonment), modified in other respects, 283 A.D. 1090, 131 N.Y.S.2d 578 (1954) (mem.).
[4] Cf. People ex rel. Trebat v. City of Park Ridge, 110 Ill.App.2d 404, 414, 249 N.E.2d 681, 686 (1969) (bankruptcy of prior restaurateur did not result in abandonment of nonconforming use when purchasers promptly applied for restaurant remodeling permit); Diggs v. City of Wilson, 25 N.C.App. 464, 213 S.E.2d 443, 444 (1975) (although zoning statute provided for loss of right to nonconforming use upon discontinuance of use for 180 days, closing of business for one year to remodel pursuant to city permit specifying no time limitation did not constitute "discontinuance"); McDonald v. Board of Adjustment, 561 S.W.2d 218, 222 (Tex.Civ.App.1977) (when zoning ordinance allowed change in nonconforming use to nonconforming use of same or more restricted class without administrative approval, unsuccessful attempt of property owner to substitute nonconforming metal manufacturing plant for nonconforming warehouse did not constitute abandonment of nonconforming use).

Unauthorized physical changes in a building, by contrast, may provide the overt act and indicate the intent necessary to show abandonment. See, e. g., Stieff, supra, 237 Md. at 606-07, 207 A.2d at 492; Beyer v. Mayor & City Council of Baltimore City, 182 Md. 444, 454, 34 A.2d 765, 769 (1943); Chipolone v. Municipal Council of City of Clifton, 137 N.J.L. 307, 310, 59 A.2d 815, 817, aff'd, 1 N.J. 93, 61 A.2d 896 (1948) (per curiam). See generally 1 R. Anderson, supra § 6.62.
[5] The reasons for our decision in George Washington University were not explicated in the order. We do not understand the order to hold that nonconforming uses do not run with the land.
[6] Intervenor's statement on cross-examination that "it would be correct to say" that he had "abandoned [his] clothing store use with no intent to return" represents a lay interpretation of the term and does not undercut the Board's legal conclusion.
[7] By reducing such property owners' options, in effect, to retaining their present use or selling to the University for campus development, the approach advocated by petitioner could artificially depress the values of property within campus boundaries and give a windfall to the University.
[8] Although the Board did not expressly condition its order upon compliance by the restaurant "with the standards of external effects established for a C-M District in Sub-section 6106.6," D.C. Zoning Regs. § 7109.113, the Board did require, in accordance with its finding of fact and the noise level requirements of D.C. Zoning Regs. § 6106.61, that "[t]here shall be no live entertainment on the premises and no recorded music shall be amplified so it is audible outside the restaurant" (Finding 14). Insofar as the other requirements of § 6106.6, concerning such externalities as emission of smoke, odorous gases, noxious fumes, cinders, glare or heat, and ground vibration, are relevant to a small restaurant operation, the Board's order should be held to incorporate a requirement of compliance with those standards by virtue of the mandate of D.C. Zoning Regs. § 7109.113 itself.

Contrary to petitioner's contentions, the Board also adequately considered the "general character of uses and structures" within 300 feet of the property, id. § 7109.121 (emphasis omitted) (Findings 6, 7); "deleterious external effect[s]," id. § 7109.124 (Findings 11-12); "safeguard[s] designed to shield the neighborhood from any adverse effect," id. § 7109.125 (Finding 14); and "[t]he amount of parking or loading facilities provided." Id. § 7109.126 (Findings 12, 17). Petitioner does not assert that the Board failed to discharge its duties under §§ 7109.122-.123.
Finally, also contrary to petitioner's assertion, the Board's finding that "[n]o structural alteration would be made other than those required by municipal law or regulation" is supported by substantial evidence provided by the testimony of the civil engineer and architect for the project and the authorized representations of counsel for intervenor. The parties agree that the Board apparently has placed a sensible gloss on the proviso of D.C. Zoning Regs. §§ 7105.2, 7106.112, to permit structural alterations required by municipal law not only in connection with changes from one nonconforming use to another, but also for extensions of nonconforming uses. Petitioner therefore does not cast  and we do not read  the Board's order as permitting any structural alteration prohibited by D.C. Zoning Regs. §§ 7105.2, 7106.112. See Lenkin, supra.