James T. DRAUDE, Petitioner,

v.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent.

and

The George Washington University, Intervenor.

Nos. 85–1769, 86–182.

District of Columbia Court of Appeals.

Argued Nov. 25, 1986.

Decided June 9, 1987.

James T. Draude, Washington, D.C., pro se.*

Beverly J. Burke, Asst. Corp. Counsel, with whom John H. Suda, Acting Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Norman M. Glasgow, with whom Louis P. Robbins and C. Francis Murphy, Washington, D.C., were on the brief, for intervenor.

Before NEWMAN, FERREN and TERRY, Associate Judges.

FERREN, Associate Judge:

James Draude appeals two decisions of the Board of Zoning Adjustment (BZA or Board) approving variances and special ex-

---

* Michael B. McGovern, Washington, D.C., was on the brief for co-petitioner President Condominium Ass'n, which voluntarily withdrew its petitions for review in these cases at oral argument.

ceptions that would allow George Washington University (GWU) to construct a medical building next to the President Condominium in which Draude owns a unit and lives. Because the proposed structure is essentially an addition to the existing H.B. Burns Memorial Building, we shall refer to it as the "Addition." We agree with Draude that the BZA erred when it ruled the proposed Addition did not require a variance from the zoning regulation barring additions that extend a nonconforming aspect of a structure devoted to a conforming use. 11 DCMR §§ 2001.1 & 2001.3 (1986).[1] We also agree that the BZA erred in ruling that the Addition conformed to the bulk limitations of the R–5–C zoning district, calculated under 11 DCMR § 210.3, because it failed to exercise its discretion as to whether a special exception to the bulk limitations was appropriate under the relevant criteria. Furthermore, we agree that the BZA's decision approving a special exception for university construction in a residential district did not correctly deal with issues of traffic congestion and diminished light and air. Finally, we agree with Draude that the BZA's decision granting a variance to permit a nonconforming open court relied on faulty legal analysis. *See* 11 DCMR §§ 201.3 & 406.1. We therefore reverse and remand for further proceedings.

## I.

GWU proposes to build a large addition to the H.B. Burns Memorial Building, which currently houses medical offices for the faculty of GWU's Medical School. The Burns Building is located at the southeast corner of Pennsylvania Avenue and 22nd Street, NW, and the property on which GWU plans to construct the Addition stretches south from the Burns Building along the east side of 22nd Street to Eye Street. The Addition is intended to relieve crowding in the Burns Building and to consolidate other medical functions now spread out among different buildings on and off the GWU campus. GWU has designed the Addition as an integrated and comprehensive outpatient, or ambulatory care, facility. Residents of the neighboring President Condominium challenged the proposed construction through their condominium association, and James Draude sued individually as a resident of the condominium. The condominium association has since withdrawn its petitions for review, and Draude is now the sole petitioner.[2]

Draude's substantive complaints arise primarily because a portion of the west wall of the condominium runs flush along the boundary separating it from the lot on which the Addition is to be built, and the remainder of the condominium's west wall is set back only about fifteen feet from the property line. According to Draude's evidence, the east wall of the Addition would tower approximately 35–40 feet above the west wall of the condominium. As a consequence, the Addition would block light and air now coming to apartments situated along the west side of the condominium. Draude also argued before the BZA that the Addition would unreasonably increase vehicular and pedestrian traffic in the immediate neighborhood.

During the course of the administrative proceedings, GWU proposed two slightly different building plans, Scheme 1 and Scheme 2. The BZA has approved all the variances and special exceptions it deems

---

1. All citations to zoning regulations refer to the 1986 edition of Title 11 of the District of Columbia Municipal Regulations (DCMR). The BZA's orders under appeal here do not use the DCMR compilation and numbering but instead employ a distinct compilation of the zoning regulations. This discrepancy has not made our task easier, although fortunately the parties cross-referenced their citations. The BZA should note that D.C. Code § 1–1538 (1981 & 1986 Supp.) repealed all regulations not published in the DCMR on or before June 30, 1984. Moreover, the Council of the District of Columbia clearly intends that the DCMR shall be the official compilation of the regulations of the District. *See* D.C. Code § 1–1532 (1981). Orders of the BZA, therefore, should cite regulations according to the DCMR.

2. After the condominium association withdrew its petitions for review, we asked for additional briefing to determine whether Draude had standing to prosecute the appeal in his own right. By an order dated February 6, 1987, we held that Draude does have standing.

necessary for Scheme 2, and these petitions for review concern only this second of the two plans. Scheme 2 came about to alleviate the effect the Scheme 1 Addition would have had on the neighboring condominium. In particular, Scheme 2 shifts the Addition further to the west, in order to create a space of about 21 feet between the Addition and the condominium property line. According to Draude's evidence, Scheme 2 accordingly would leave about 36 feet between the Addition and those apartments with living room windows facing west. The parties differ as to whether Scheme 2 meaningfully improves the effect of the Addition on light and air coming to apartments on the condominium's west side.

At issue are two BZA rulings, which we have consolidated for review.[3] In BZA Order I, the Board approved a decision of the Zoning Administrator that neither Scheme 1 nor Scheme 2 required a variance from 11 DCMR § 2001.3, which enjoins any addition to an existing nonconforming structure that extends the nonconformity. In the second ruling, BZA Order II, the Board granted GWU's application for two special exceptions and two variances required for construction according to Scheme 2. The special exceptions were, first, as required by 11 DCMR § 210, for the construction of any university building in a residential district, and, second, as required by 11 DCMR § 411, for certain penthouse structures not conforming to preferred specifications. The variances granted were, first, to permit the open court created by Scheme 2 between the Addition and the condominium to vary from the dimensions mandated by 11 DCMR § 406, and, second, to avoid the prohibition of 11 DCMR § 2001.3 on additions to an existing nonconforming structure (the Burns Building) that create a new nonconformity (the open court).

Draude now argues that all these rulings were erroneous. In particular, he contends that (1) Scheme 2 requires a variance because it extends the existing nonconforming floor area ratio of the Burns Building; (2) the BZA failed to exercise its discretion

before relaxing the bulk limitations, pursuant to 11 DCMR § 210.3, in the residential district where the Addition would be located; (3) the BZA improperly granted the special exception for university buildings in residential districts because it erroneously analyzed issues of traffic congestion and air and light; and (4) a variance for the open court was wrongly granted because the BZA misapplied the appropriate standards for area variances. Beyond these objections, Draude has raised a dizzying array of further complaints against the procedures and merits of the BZA actions—complaints we briefly address at the end of this opinion.

## II.

The Burns Building is located entirely within a C–3–C commercial zone, and, as a university building, is located there as of right. 11 DCMR §§ 701.6(f), 721.1 & 741.1. Its floor area ratio (FAR) and height, however, exceed the permitted FAR and height for buildings in a C–3–C district. BZA Order II ¶¶ 10 & 28; see 11 DCMR §§ 770.1 & 771.2. The Burns Building, therefore, is a nonconforming structure devoted to a conforming use. 11 DCMR § 199.9; see id. §§ 2000.5(b) & 2001.1. The Addition would have an FAR exceeding that permitted in the R–5–C residential district in which it is almost entirely located but would conform to the applicable height limits. BZA Order II ¶¶ 9 & 11; see 11 DCMR §§ 400.1 & 402.4. Under 11 DCMR § 2001.3(c), additions to or enlargements of a nonconforming structure are permitted only if (among other requirements) "[t]he addition or enlargement itself shall not increase or extend any existing, nonconforming aspect of the structure." At first glance, therefore, the Addition appears not to meet the requirements of § 2001.3, since it would extend a "nonconforming aspect" of the Burns Building, its FAR.

■ The zoning regulations, however, create a special rule—which for conve-

---

**3.** We shall refer to the two BZA orders under review as follows: (a) the order in BZA Appeal No. 14261, dated December 20, 1985, as "BZA Order I" and (b) the order in BZA Appeals No. 14297 & No. 14344, dated January 28, 1986, as "BZA Order II".

nience we shall call the "aggregation rule" —for measuring the bulk restrictions on university buildings in residential districts: In R–1, R–2, R–3, R–4, R–5–A, and R–5–B districts, the maximum bulk requirements normally applicable in the districts may be increased for specific buildings or structures; Provided that the total bulk of all buildings and structures on the campus shall not exceed the gross floor area prescribed for the R–5–B district. *In all other residential districts,* similar bulk increases may also be permitted; Provided, that the bulk of all buildings and structures on the campus shall not exceed the gross floor area prescribed for the R–5–C district. Because of permissive increases as applicable to normal bulk requirements in the low-density districts regulated by this title, it is the intent of this subsection to prevent unreasonable campus expansion into improved low-density districts.

11 DCMR § 210.3 (emphasis added). The BZA concluded that § 210.3 permits GWU to aggregate the FAR of the Burns Building—located in a commercial district—with that of other campus structures and thereby avoid the FAR limits otherwise applicable to it under 11 DCMR § 771.2. On this premise, the Burns Building itself becomes a conforming structure with respect to FAR (but remains nonconforming with respect to height). The Addition, therefore, would meet the requirement that extension of a nonconforming structure "not increase or extend any existing, nonconforming aspect of the structure," 11 DCMR § 2001.-3(c), because (1) the Addition will not extend the Burns Building's nonconforming height, and (2) the Addition's own nonconforming FAR will not be an increase or extension of a "nonconforming aspect" of the Burns Building.

As Draude points out, however, the regulation on which the BZA relies for this argument by its terms applies only to university buildings in residential districts, whereas the Burns Building is located entirely within a commercial district. The BZA, nonetheless, broadened the regulation, despite its express language, because the BZA concluded that the policy reasons justifying the aggregation rule apply equally whether a university building is located in either a residential or a commercial zone. BZA Order II ¶¶ 21–27 & pp. 11–12. The BZA ruled that "[t]he permitted FAR for a college or university is dictated by its approved campus master plan and the campus boundaries therein," regardless of the zoning district in which any given structure is located. *Id.* at p. 11. Thus, according to the BZA, "[t]he FAR for residentially zoned areas ... is combined with the permitted FAR for nonresidentially zoned areas to achieve an aggregate campus FAR for overall development." *Id.*

In evaluating the legality of the BZA's expansive interpretation of 11 DCMR § 210.3, we begin with the premise that the BZA has no power "to amend any regulation or map." D.C. Code § 5–424(e) (1981). The BZA must, of course, interpret the regulations when their meaning is ambiguous or open-ended, and "[i]t is an established maxim of review that an agency's interpretation of its administrative regulations is to be given great deference and to be upheld unless clearly erroneous or inconsistent with the regulations." *Sheridan-Kalorama Neighborhood Council v. District of Columbia Board of Zoning Adjustment,* 411 A.2d 959, 961 (D.C.1979) (footnote omitted); *see also George Washington University v. District of Columbia Board of Zoning Adjustment,* 429 A.2d 1342, 1348 (D.C.1981); *Lenkin v. District of Columbia Board of Zoning Adjustment,* 428 A.2d 356, 358 (D.C.1981). Here, we conclude the BZA's interpretation of the regulations is inconsistent with the language of 11 DCMR § 210.3 and with the structure of the regulations adopted by the Zoning Commission to govern university development.

We begin by noting that colleges and universities may locate as of right in commercial districts without reference to a campus plan. 11 DCMR §§ 701.6(f), 721.1, 741.1 & 751.2(a). Colleges and universities also may locate in special purpose, mixed use, and waterfront districts if, among other requirements, (1) they submit, and the BZA approves, "a plan for developing the

campus as a whole," and (2) the BZA grants a special exception "in accordance with the conditions specified in § 3108 of Chapter 31 of this title [11]." 11 DCMR §§ 507 (special purpose), 615 (mixed use) & 912 (waterfront). Finally, as in special purpose, mixed use, and waterfront districts, colleges and universities may locate in residential districts if, among other requirements, they have an approved campus plan and obtain a special exception. As to residential districts, however, there is an express relaxation of the maximum bulk requirements that otherwise would be applicable to colleges or universities locating there, namely the aggregation rule in 11 DCMR § 210.3 quoted above. The regulation expressly states that although it creates "permissive increases" in the bulk requirements otherwise applicable in residential districts, "it is the intent of this subsection to prevent unreasonable campus expansion into improved low-density districts." *Id.*

From this regulatory structure and language we note, first, that the aggregation rule expressly applies only to residential districts. Second, the aggregation rule is noticeably absent not only from the rules governing commercial districts but also from those governing the three other non-residential zoning districts, where colleges and universities are permitted—as in residential districts—by special exception after approval of a campus plan. That the rule applies uniquely to residential districts is highlighted by its conspicuous omission elsewhere in the zoning regulations, especially in districts where universities are permitted only by special exception. Finally, the aggregation rule of § 210.3, while designed to permit increased density in residential districts for the benefit of colleges and universities, is also expressly intended "to prevent unreasonable campus expansion" into residential areas; that is to say, there is flexibility within carefully prescribed limits. This language at the end of § 210.3, therefore, warns against an expansive interpretation of § 210.3 that is not clearly indicated. We perceive no basis for extending the express language of § 210.3 to permit increased bulk limitations not

only in commercial but also, inevitably, in other non-residential zoning districts. Such rewriting of § 210.3 would foster campus expansion in derogation of a regulation expressly intended to place a reasonable cap on flexible application of the bulk requirements.

The BZA suggests that limiting the FAR rule to residential districts would be irrational. That is not necessarily true. Omitting the aggregation rule from other districts in which university building is restricted, and from commercial zones where it is not, may have at least three justifications. The absence of FAR aggregation may intentionally discourage large-scale university developments in nonresidential zones beyond the bulk restrictions normally applicable there. Moreover, nonresidential districts generally have higher FAR limits than do residential districts; the aggregation rule may serve merely to make up for the lower limits in residential districts, without intending to raise the limits applicable to university buildings in other districts. Finally, as this case illustrates, extension of the aggregation rule to nonresidential districts can have a significant impact on residential districts, which § 210.3 itself expressly intends to limit to reasonable campus expansion. It is, therefore, legally sound to permit the language of the zoning regulations themselves, as adopted by the Zoning Commission, to control university FAR without rearrangement by the BZA.

For these three reasons, the discrepancy between the treatments of university FAR in residential and nonresidential zoning districts is not clearly irrational. The BZA's reasoning appears to assume or endorse the principle that a campus plan replaces otherwise applicable zoning regulations within its boundaries. That principle finds no basis in the zoning statute or regulations.

██ Accordingly, we conclude that the Burns Building is nonconforming as to FAR and that the Addition would extend this nonconforming aspect of the Burns Building. The BZA, therefore, cannot permit GWU to build the Addition according to

Scheme 2 without a variance, *see* 11 DCMR § 3107.2, from the prohibition on additions to nonconforming structures that extend a nonconforming aspect of the existing structure. 11 DCMR § 2001.3.

### III.

Universities cannot use the composite FAR as a matter of right in residential zoning districts; they must obtain a special exception under 11 DCMR § 210.3. *See* 11 DCMR § 3108.1 (listing actions requiring special exceptions). Draude points out that the BZA orders do not address the special exception required before GWU can use the FAR aggregation rule in order to build the Addition with an FAR substantially in excess of that normally permitted in an R–5–C district. Because we can find no reference to this question in the BZA orders under review, the BZA on remand must determine whether such a special exception is justified.

The FAR aggregation rule for university buildings states that, "[b]ecause of permissive increases as applicable to normal bulk requirements in the low-density districts regulated by this title, it is the intent of this subsection to prevent unreasonable campus expansion into improved low-density districts." 11 DCMR § 210.3. In general, special exceptions may only be granted where they are "in harmony with the general purpose and intent of the Zoning Regulations and Maps and will not tend to affect adversely the use of neighboring property in accordance with the Zoning Regulations and Zoning Maps...." 11 DCMR § 3108.1. Thus, before approving a university structure such as the Addition on the basis of the FAR aggregation rule, the BZA must find that the permitted expansion in the structure's bulk (1) is consistent with the policy of avoiding "unreasonable expansion into improved low-density districts" and (2) "will not tend to affect adversely the use of neighboring property."

The BZA addressed neither issue in this case, even though the orders under review assume that the Addition would take advantage of the composite campus FAR. In BZA Order II, the Board stated only that the injunction against unreasonable expansion into low-density residential districts did not arise here because 11 DCMR § 210.3 "has no application to nonresidentially zoned properties used for college or university uses." BZA Order II ¶ 27. This statement, interestingly, is *ad hoc* and, from our point of view, ironic, since the Board had to rely on § 210.3 to conclude that the Burns Building, which is located in a commercial district, does not exceed FAR limits. In any case, we agree that § 210.3 does not apply to nonresidential zones. But Draude's point is that the section certainly does apply to the Addition, located in a residential district, and that the BZA must exercise its discretion before permitting GWU to employ the FAR aggregation rule with respect to the Addition.[4] We agree, and the BZA, on remand, must consider Draude's argument that the Addition does not qualify under the applicable standards for a special exception pursuant to 11 DCMR §§ 210.3 and 3108.1.

### IV.

Because university buildings cannot be constructed as of right in residential zones, the Addition required, and the BZA granted, a special exception under 11 DCMR § 210.1 to permit construction of the Addition on the lot in question. Draude maintains that the BZA abused its discretion in granting this special exception because the Addition does not meet the standards of 11 DCMR § 210.2, stating that "[u]se as a college or university shall be located so that it is not likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions." Draude argued before the BZA that the Addition would create objectionable traffic conditions and, further, was objectionable because it would greatly diminish light and air to apart-

---

**4.** In BZA Order I, the Board stated that the FAR was not properly before it, because the issue had been raised and addressed in Appeals No. 14297 and No. 14344, which are the subjects of BZA Order II. *See* BZA Order I ¶ 79.

ments on the west face of the condominium. The Board found, however, that the Addition would neither "create objectionable traffic conditions" nor "create objectionable light and air conditions." BZA Order I ¶¶ 57 & 132. Draude now asserts that the finding on traffic impacts lacked substantial evidence in the record[5] and that the BZA applied improper legal standards in concluding that the Addition's effect on light and air was not "objectionable" under 11 DCMR § 210.2. We agree that the BZA did not adequately justify its traffic finding; nor did it correctly analyze the light and air question under § 210.2.

### A.

### (1)

■ In reaching its decision that the Addition would not create objectionable traffic in the neighborhood, the BZA relied on the testimony of Mr. Callow, an expert "traffic, transportation and environment consultant" hired by GWU, as well as on a study performed by health planners with GWU and on a report of the District of Columbia Department of Public Works. BZA Order I ¶¶ 56–59 & 65–67. In addition, the BZA explained what it viewed as the defects of Draude's contrary traffic analysis. *Id.* ¶ 135. We must affirm such legal conclusions if they rationally flow from findings of fact supported by substantial evidence in the record as a whole. *E.g., George Washington University*, 429 A.2d at 1345 (citing cases); *Citizens Ass'n of Georgetown v. District of Columbia Zoning Comm'n*, 402 A.2d 36, 41–42 (D.C.1979); D.C.Code §§ 1–1509(e) & 1–1510(a)(3)(E) (1981).

■ The parties appear to agree that a structure's effect on traffic is not "objectionable" under the regulations if the increase in traffic it creates is not "objectionable." Draude objects to the BZA's conclusion specifically on the ground that the Board did not in fact receive evidence about current staff levels at the Burns

Building and the traffic it generates and, thus, could not compare current traffic to future traffic if the Addition is built. The Board relied on GWU's traffic studies and expert testimony for calculations of the traffic generated by current staff, faculty, and patients. *See* BZA Order I ¶¶ 52 & 58–59. But these figures were not for the Burns Building alone; they were for the Burns Building plus other non-campus facilities that would be consolidated into the expanded Burns Building complex. Figures for all facilities currently on-campus were then compared with numbers of staff, faculty, patients, and trips for the Burns complex once all on- and off-campus ambulatory care facilities have been consolidated in the extended Burns Building. The traffic consultant, however, did not know what proportion of the persons and trips generated by all currently on-campus facilities are attributable to the Burns Building alone. Nor was there a finding that the on-campus facilities other than the Burns Building now affect traffic in the neighborhood of the proposed Addition. If these additional facilities do not now contribute to the traffic in the immediate area in question here, then GWU's estimate of correct traffic levels in the neighborhood was too high, and its traffic calculations underestimated the expected traffic increase the Addition would cause.

Draude raised this logical deficiency in GWU's evidence, but the BZA did not address the problem in its orders. Insofar as the BZA, in concluding that traffic caused by the Addition will not become objectionable, relied on GWU's expert evidence, its conclusion does not rationally follow from the evidence presented. This defect might prove curable with additional record information regarding the current traffic effects on the particular area in question of the Burns Building alone and of the other on-campus facilities included in GWU's traffic calculations.

---

5. Draude also contends that the BZA improperly forbade cross-examination of GWU's traffic expert after he had testified in rebuttal of traffic evidence presented by Draude and the condominium association. Because, however, Draude does not even attempt to show what prejudice he suffered from the Board's actions, we do not determine whether the BZA abused its discretion in so limiting cross-examination.

The BZA also cited the Department of Public Works' view that any traffic increase would not prove objectionable. BZA Order I, however, does not make clear whether the Board drew on GWU's evidence and on the Department's recommendation as alternative, individually sufficient grounds for its conclusion. BZA Order I ¶¶ 65–66. Because "substantial doubt exists whether the agency would have made the same ultimate finding with the error removed," we cannot invoke the " 'rule of prejudicial error.' " *Arthur v. District of Columbia Nurses' Examining Bd.*, 459 A.2d 141, 146 (D.C.1983) (quoting D.C.Code § 1–1510 (1981)); *accord, Liberty v. Police & Firemen's Retirement and Relief Bd.*, 410 A.2d 191 (D.C.1979); *Jameson's Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Bd.*, 384 A.2d 412, 419 (D.C.1978). On remand, the Board should answer Draude's argument and, if necessary, recalculate traffic effects of the Addition.

(2)

Draude also argues that the BZA never sufficiently addressed the evidence presented on two additional traffic issues, even though BZA Order I expressly recognized that the Addition's opponents had raised these issues. Specifically, evidence was presented that cars entering the Addition's parking garage would come into substantial conflict with pedestrian traffic along the sidewalk, and that significant traffic conflicts would occur as vehicles moving east on Eye Street attempted to cross traffic moving west in order to enter the parking garage. The Board appears to have made no findings on these specific issues, as opposed to general findings on increased traffic. The finding in ¶ 67 of BZA Order I is not responsive, because it deals with conflicts between pedestrians on the sidewalk and persons entering the facility by foot from cars, not with the effect of traffic attempting to enter the underground garage from the street. Elsewhere the BZA stated that "[t]he proposed addition will generate only 1.5 trips per minute during peak hours and the Board finds that it will not generate objectionable traffic lev-

els." *Id.* ¶ 125. But the subject matter of this finding is not at all clear.

An agency such as the BZA must make "findings on 'each contested issue of fact.' " *Citizens Ass'n of Georgetown*, 402 A.2d at 41 (quoting D.C. Code § 1–1509(e) (1981)). The Board need not provide its reasons for adopting one or another position on the "basic" or "underlying" facts which were themselves disputed by the parties. *Id.* at 44–46. Nevertheless, the Board must reach sufficiently detailed findings on basic factual issues to demonstrate that it has considered and ruled upon each of the party's contentions. Because this case raised a variety of traffic issues, and the Board's statements that traffic would not be objectionable under GWU's plan are ambiguous, we believe the general conclusions set forth in BZA Order I are not sufficiently responsive to the opponents' concerns to constitute findings on all "basic" or "underlying" facts with respect to traffic effects of the Addition. Because those attacking the Addition raised before the BZA the question of conflict with pedestrian traffic and difficulties with entering the Addition's garage, *see* BZA Order I ¶¶ 107–09, the Board on remand should specifically address these issues.

**B.**

Draude also contends that the Addition's effect on light and air to the condominium apartments is an "objectionable condition[ ]" that should bar design and placement of the Addition as proposed. *See* 11 DCMR § 210.2. The BZA responded with two arguments: first, that each land owner is responsible for providing his or her own light and air, so that the zoning laws should not be used to make one property owner provide light and air for another; and, second, that if GWU were building a nonuniversity structure, it could as a matter of right construct a building with an equally damaging impact on the neighboring condominium. BZA Order I ¶¶ 132–34. We believe that neither of these arguments reflects a defensible interpretation of the "objectionable conditions" rule of § 210.2. On remand, the BZA should re-

evaluate the significance it must accord the Addition's effect on light and air to the condominium.

The BZA's first argument against allowing the effect on light and air to have any weight in determining whether the Addition is "likely to become objectionable to neighboring property," 11 DCMR § 210.2, begins with a premise: "The law is well established that a property owner must provide his own light and air from his own land." BZA Order I ¶ 132. From this premise the BZA concludes that blocking light and air cannot be "objectionable" within the meaning of the zoning regulations.

■ It is true that at common law each property owner had to ensure for himself the light and air desired for structures on the land. *E.g.,* 1A G.W. Thompson, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY §§ 235–39 (1980); 3 H.B. Tiffany, THE LAW OF REAL PROPERTY § 763 (3d ed. 1939 & 1987 Supp.). But this fact may have little relevance to whether preserving light and air for neighboring property is a purpose of a given zoning regulation. For example, the effect on traffic in the area is an important factor in granting or denying a special exception under § 210, but at common law one had no right to prevent nearby development because it would bring disturbing traffic. The zoning laws came about partially to supplant common law property rights. Indeed, the zoning regulations expressly provide that one purpose to be recognized "[i]n their interpretation and application" is "[t]o provide light and air." 11 DCMR § 101.1; *see also* 11 DCMR § 411.10 (requiring that "the light and air of adjacent buildings shall not be affected adversely" as one condition for special exceptions for nonconforming penthouse structures). Once again, the BZA's reasoning here is simply *ad hoc,* for the BZA itself considered the effect on light and air in granting a variance for the nonconforming open court included in Scheme 2. *See* BZA Order I ¶ 44; Part V. below. Moreover, the Board in the past has argued, and this court implicitly has accepted, that adverse effect on light and air to

neighboring property can constitute a reason for denying a variance under the zoning regulations. *See Roumel v. District of Columbia Board of Zoning Adjustment,* 417 A.2d 405, 407–08 (D.C.1980). We see no reason for effect on light and air to count in deciding variances but not special exceptions, and the BZA has not indicated it is prepared to view light and air effects as universally irrelevant to both variances and special exceptions. Accordingly, the Board must take the Addition's effect on light and air into account among other factors weighing for and against the special exception for construction of the Addition in a residential district.

The BZA's second reason for discounting the Addition's adverse effect on light and air is premised on an argument that it did, in fact, take them into account. The BZA asserts that, because an as-of-right structure on the same lot could have an equally damaging impact, there is nothing peculiarly objectionable about this university building. The BZA appears, then, to rely on a principle that special exceptions to allow a university structure should not be denied if a non-university building could be built on the same lot with equal adverse effects on the neighborhood. Under this interpretation of the injunction that "a college or university shall be located so that it is not likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions," 11 DCMR § 210.2, a university structure shall be considered "objectionable" only if it would be worse than any possible nonuniversity structure on that property. Whatever the merits of this principle, the BZA has not applied it consistently, for the Board did not use the same criterion to analyze the noise and traffic effects of the Addition. Instead, the BZA inquired whether traffic created by the Addition would be worse than traffic now existing in the neighborhood—not whether it would be worse than traffic generated by any possible nonuniversity building placed on that lot. The objectionable impact on light and air was subjected to a standard more easily met by the proponent than that applied to traffic and noise.

Moreover, the BZA's light and air analysis appears flawed in its execution. The Board apparently assumed that an as-of-right structure on the lot could be a size equal to the Addition. But the size of the Addition depends in part on two facts: as a university building the Addition can exceed usual bulk limits for its R–5–C district, and, as an extension of the Burns Building (which fronts on a street of higher elevation), it can exceed the normal height limit applicable to its lot. The Addition is 118 feet high at the eastern wall and, according to Draude, has a FAR of 5.49. An as-of-right structure not an extension of the Burns Building could rise to 80 feet at its eastern side and could not exceed a 3.5 FAR. BZA Order 1 § 133; 11 DCMR § 402.4. It is possible, therefore, as Draude contends, that the only non-university building that could equal the Addition's effect on light and air would be an 80 foot spite wall. Thus, even assuming the analysis that relies on comparison with an as-of-right building, the BZA's conclusion does not appear on the record before us to be supported by substantial evidence. On remand, if the BZA decides to evaluate the effect on light and air by comparison with an as-of-right structure, the Board should frame its comparison in terms of a realistic, conforming structure for the lot in question.

### C.

It is interesting to note that the BZA has applied two different standards in determining whether various effects of the proposed Addition are "objectionable" within the terms of 11 DCMR § 210.2. Under the first standard (applied by the Board to the noise and traffic issues), a university building is "objectionable" if it would significantly increase objectionable qualities over their current levels in the area. Under the second standard (applied to light and air issues), a university building is "objectionable" if it would significantly increase objectionable qualities over the level that an alternative, as-of-right structure would likely create. We have found no caselaw in this jurisdiction requiring one or the other approach; some commentators, however, suggest that the latter standard is the general rule. *See, e.g.,* 3 R.M. Anderson, AMERICAN LAW OF ZONING ¶ 21.14, at 692 (3d ed. 1986) ("The effect of a proposed use on its neighbors will not support a denial of a special permit unless the effect is greater than that of uses permitted in the district without special permit.") (citing cases); 6 P.J. Rohan, ZONING AND LAND USE CONTROLS § 44.03 [4] (1986).

Either standard may be a reasonable understanding of the 11 DCMR § 210.2 requirement that university buildings not be so placed as "likely to become objectionable to neighboring property." But we suggest that the BZA take care to recognize this distinction, make clear why it adopts a particular approach in a given situation, and be alert to possible problems of inconsistency. An agency may change over time the interpretation it gives to a controlling statutory term. *E.g., Greater Boston Television Corp. v. Federal Communications Comm'n,* 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852 (as modified), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). Similarly, when interpreting a term like "objectionable," the BZA may apply different standards to different situations if each standard is consistent with the regulation and the situations actually are different in a way that makes it reasonable to use different criteria for what is "objectionable." In order to ensure that all whose claims the agency adjudicates receive fair and equal treatment, however, the agency must explain and justify its change of mind or its use of a different standard from one situation to the next. *See id.*

### V.

Draude next objects to the BZA decision granting a variance that allows Scheme 2's open court to be narrower than the regulations permit under 11 DCMR § 406.1. By setting the building back from the eastern property line, Scheme 2 creates a space or "open court" 21 feet wide between the Addition's east wall and the property line it shares with the condominium's lot. BZA Order I ¶¶ 42–43. (The west wall of the

condominium is set back somewhat from the property line where the court occurs, so the total space between the Addition and the condominium would there amount to approximately 36 feet. *Id.* at ¶ 81.) The zoning regulations require that an open court in an R–5–C district for a building as high as the Addition be at least 29 feet wide. *Id.* at ¶ 42; 11 DCMR § 406.1. Draude argues that the BZA applied incorrect criteria in granting the needed variance. We agree. On remand, the BZA should reevaluate the variance application in light of standards discussed below.

 The BZA correctly described the relief GWU requires for the Scheme 2 open court as an area variance. BZA Order I p. 32; *see Association For Preservation of 1700 Block of N Street, N.W., and Vicinity v. District of Columbia Board of Zoning Adjustment,* 384 A.2d 674, 677 (D.C. 1978) (describing the difference between use and area variances). An area variance may be granted for improvement of a property if all of the following conditions are met: (1) the property suffers from "exceptional narrowness, shallowness, or shape" or from "exceptional topographical conditions or other extraordinary or exceptional situation or condition;" (2) these exceptional circumstances "result in peculiar and exceptional practical difficulties" to the owner unless he or she can obtain a variance; and (3) variance relief will not create "substantial detriment to the public good" or "substantially impair[ ] the intent, purpose, and integrity of the zone plan as embodied in the zoning regulations and map." D.C.Code § 5–424(g)(3) (1981); *Capitol Hill Restoration Society v. District of Columbia Board of Zoning Adjustment,* 398 A.2d 13, 15–16 (D.C.1979). Difficulties often arise, as they have here, in determining what kinds of hardships to a property owner arise from an "exceptional or extraordinary situation or condition of a specific piece of property." D.C.Code § 5–424(g)(3) (1981).

The BZA's order does not state precise or detailed reasons for concluding that conditions exist justifying a variance for the nonconforming open court. Nor does the order show any effort to apply rigorously the legal standard for granting variances, which we have quoted above and have enunciated in a number of prior decisions. The Board appears, however, to have found two basic grounds for granting the variance.

### A.

 First, the Board stated that "[s]trict application" of the open court rule "would produce a result that would be contrary to the intent of the Regulations[,] which is to maximize light and air." BZA Order I ¶ 44. The BZA seems to have reasoned that GWU should not be hindered from mitigating the damage its structure would do to the neighboring condominium. Draude responds that a conforming court would even better reduce the harm done, so strict application of the rules would in fact *better* serve the stated intention of the zoning regulations. That is obviously true. The BZA's argument, therefore, appears to rest on the unstated premise that GWU could build the more harmful Scheme 1 and thereby avoid the need for an open court variance. This premise has no basis in the record, for the BZA has never approved Scheme 1.

Moreover, the Board has not indicated how Scheme 2's effect on light and air fits into the criteria for granting variances. It may be that the proximity of the condominium could constitute an exceptional condition when combined with peculiar features of the lot for which the variance is sought or, alternatively, that the improved effect on the condominium from the courtyard merely helps satisfy the third element of the variance standard, *i.e.,* that the variance not impair the purposes of the zoning regulations. The Board, however, has given no clue as to the legal significance it attached to the asserted improvement attributable to allowing a nonconforming open court. That Scheme 2 is better than Scheme 1 in and of itself has no relevance to GWU's application for a variance to allow the narrow open court.

## B.

The BZA also noted that the lot's "long and narrow shape and the existence of the Burns Building[ ] constitute an extraordinary or exceptional situation or condition. . . ." BZA Order I p. 32. The lot on which the Addition is to be built measures 100 feet along Pennsylvania Avenue, 323 feet along 22nd Street, and 82 feet along Eye Street. The Burns Building occupies the northern portion of the lot, which fronts on Pennsylvania Avenue and extends about one-third of the lot's total length along 22nd Street. The southern two-thirds of the lot does appear to have a somewhat irregular shape: it begins 57 feet deep from 22nd Street where the Burns Building ends and the Addition would begin; then, moving south, it quickly widens to 100 feet deep for a distance, running south, of 125 feet, then narrows again to 82 feet for the remaining length until the lot ends at Eye Street. Thus, the Addition's lot measures about 250 feet long with a depth varying from 57 feet to 100 feet to 82 feet. Judging from the sparse language its order provides, however, in approving the variance the BZA did not conclude that the size and shape of the lot in and of themselves created practical difficulties for development, so that the lot would make conforming development practically difficult for *any* owner and for *any* purpose, not merely for GWU with its special requirements. Instead, the order suggests that it is GWU's need for a large medical facility that creates practical difficulties for this particular owner.[6]

The concept of an "exceptional condition" in the variance context refers to unusual conditions *of the property*, not merely to unusual circumstances personal to the owner and related to the property only in the sense that the owner's personal situation makes it difficult to develop the land consistently with the zoning regulations. *See Capitol Hill Restoration Society*, 398 A.2d at 16. Furthermore, the BZA generally cannot grant a variance just because the property makes it difficult for the owner to construct a particular building or to pursue a particular use without a variance if the owner could use or improve the land in other ways compatible with zoning restrictions. *Palmer v. District of Columbia Board of Zoning Adjustment*, 287 A.2d 535, 540 (D.C.1972). On the other hand, existing structures on the land are part of the "property" and may be "exceptional conditions" for variance purposes. *Clerics of Saint Viator, Inc. v. District of Columbia Board of Zoning Adjustment*, 320 A.2d 291, 293–94 (D.C.1974). Moreover, we have held that the need to expand an existing building may constitute the kind of exceptional condition of the property that justifies a variance:

> [W]hen a *public service* has *inadequate facilities* and applies for a variance to *expand* into an adjacent area in common ownership which has long been regarded as part of the same site, then the Board of Zoning Adjustment does not err in considering the *needs* of the organization as [a] possible "other extraordinary and

---

6. The BZA also lists among the factors that create "[p]ractical difficulties" for GWU "the applicability of an approved campus plan which precludes matter of right development." BZA Order I ¶ 75. But the existence of a campus plan restraining placement of a given building in other areas of the campus cannot serve as the kind of "exceptional condition" that justifies a variance. In this context the campus plan should be viewed much like other zoning restrictions placed on the university. For instance, that an alternative location would also require a variance from applicable zoning restrictions is no ground for granting a variance to allow construction at a favored site. Nor is a campus plan that forecloses alternative on-campus locations for the Addition a ground for granting variances to allow construction at the

22nd Street site. Instead, if no other "exceptional circumstances" that preclude alternative locations for the Addition exist, the university has the right to seek an amendment of the campus plan or to build in a commercial district. Indeed, amendment of the campus plan does not require the university to meet the relatively difficult variance criteria. To amend the campus plan, GWU need only meet the criteria for any university building in a residential district: that the extension of the university "is not likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable standards." 11 DCMR § 210.2; *Marjorie Webster Junior College v. District of Columbia Board of Zoning Adjustment*, 309 A.2d 314, 317 (D.C.1973).

exceptional situation or condition of a particular piece of property."

*Monaco v. District of Columbia Board of Zoning Adjustment*, 407 A.2d 1091, 1099 (D.C.1979) (quoting D.C.Code § 5–424(g)(3) (1981)) (emphasis added). In this situation, the possibility of alternative uses does not necessarily show that no "exceptional condition" exists. The need to expand does not, however, automatically exempt a public service organization from all zoning requirements. Where a public service organization applies for an area variance in accordance with *Monaco*, it must show (1) that the specific design it wants to build constitutes an institutional necessity, not merely the most desired of various options, and (2) precisely how the needed design features require the specific variance sought. Thus, in the present case, GWU must prove to the BZA that it requires a design that cannot conform to the open court requirement.

Draude also objects to the BZA's reasoning on the ground that the Board relied on needs personal to GWU rather than on features of the property that would present practical difficulties to anyone who owned that lot. The *Monaco* decision rejected that argument for situations in which public service organizations seek to expand existing facilities on the same lot. Unfortunately, however, the BZA did not attempt to explain why the lot's unusual shape and the existence of the Burns Building specifically demanded a nonconforming open court. In fact, when it turned to state the second element required for a variance—that the unusual condition create practical difficulties for the owner—the BZA relied on the proposition that "[s]trict application of the Zoning Regulations ... would decrease the amount of light and air reaching the President Condominium in order [sic] to produce a result contrary to the intent of the Regulations." BZA Order I pp. 32–33. But, first, this proposition again assumes that Scheme 1 represents an approved, and indeed the only, alternative to Scheme 2; and, second, the impact on the condominium could hardly present practical difficulties to GWU, unless the BZA would *not* approve Scheme 1 because of this impact. The fact that the BZA would not approve an alternative design does not justify granting a variance to a different nonconforming design that the Board likes better.

The BZA's order does note at one point that "[f]urther reductions [in floor area] will materially affect the quality of the program." BZA Order I ¶ 47. The Board may have accepted evidence that GWU's needs in expanding its existing medical facilities on the lot would be greatly frustrated or entirely defeated were the Addition redesigned to accommodate a conforming open court. The BZA heard testimony from two witnesses, the project architect and a health care consultant deeply involved in the design of the Addition, who stated that the floor area of Scheme 2 could not be significantly reduced and still meet GWU's specifications. If the Board accepts this testimony and finds that a conforming open court would *require* significant reductions of floor area, then a variance may be justified. But the BZA's order gives scant attention to this crucial question and does not expressly rely on the evidence of necessity in stating its conclusion that GWU has met the requirements for the open court variance. We conclude, therefore, that on remand the Board should reconsider whether the Addition meets the requirements stated above for a variance to allow necessary extension of an existing structure by a public service organization.

## VI.

We reject Draude's remaining objections to the BZA orders on appeal. He raises two further substantive arguments: that the BZA improperly approved a nonconforming penthouse structure as a special exception, rather than requiring a variance, and that the BZA failed to give "great weight" to the views of the Advisory Neighborhood Commission (ANC). The Zoning Commission has amended the zoning regulations expressly to permit special

exceptions for two or more penthouse structures on a single building. Zoning Comm'n Order No. 508.[7] The Commission's action renders Draude's penthouse claims moot on remand. With respect to the ANC recommendation that the Addition not be permitted to proceed as designed, we conclude the BZA "accorded to the Advisory Neighborhood Commission 2A the 'great weight' to which it is entitled by statute." BZA Order I p. 33. *See Kopff v. District of Columbia Alcoholic Beverage Control Board,* 381 A.2d 1372 (D.C.1977). Draude also raises a number of procedural objections to the conduct of the hearings in this matter and the preparation of the final version of BZA Order I. On the assumption that a new hearing will be held and the record reopened, these procedural objections are rendered moot by our decision to reverse both of the Board's orders on appeal.

*Reversed and remanded.*

NEWMAN, Associate Judge, dissenting:

I dissent. Since construction proceeds, and thus, time is of the essence, I forebear taking the considerable time required to elucidate the reasons I disagree with my colleagues in this case.

---

7. Zoning Commission Order No. 508 states that it amends 11 DCMR § 411.11 to read as follows:

 Where impracticable because of operating difficulties, size of building lot, or other conditions relating to the building or surrounding area that would tend to make full compliance unduly restrictive, prohibitively costly, or unreasonable, the Board of Zoning Adjustment shall be empowered to approve the location, design, *number, and all other aspects of such structure* regulated under Subsections 411.3 through 411.6....

The italicized words are those added by Order No. 508. (According to the June 1986 edition of title 11 of the DCMR, the section amended by Order No. 508 would be § 411.10, not § 411.11 as the order designates the amended section. We have no explanation for the discrepancy.)