CITIZENS ASSOCIATION OF GEORGE-TOWN et al., Petitioners,

v.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent,

The President and Directors of George-town University, Intervenors.

No. 13008.

District of Columbia Court of Appeals.

Argued Oct. 12, 1978.

Decided June 21, 1979.

Rehearing and Rehearing En Banc Denied Aug. 29, 1979.

John D. Taurman, Washington, D. C., with whom Timothy A. Harr, Washington, D. C., was on the brief, for petitioners.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., with whom Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., adopted the brief of intervenor, for respondent.

Norman M. Glasgow, Washington, D. C., with whom C. Francis Murphy and John F. McCabe, Jr., Washington, D. C., were on the brief, for intervenors.

Before KERN, NEBEKER and MACK, Associate Judges.

NEBEKER, Associate Judge:

Petitioners seek to set aside as an abuse of discretion the Board of Zoning Adjustment's (BZA's or Board's) order approving intervenors' Campus Development Plan (plan). Challenged are the conclusions that approval of the campus plan does not constitute an endorsement of unreasonable campus expansion and that implementation of the plan will not create objectionable traffic conditions. Intervenors defend the Board's order as being supported by substantial evidence in the record. We affirm in part and remand for a reconsideration of the BZA's conclusion regarding the campus boundaries.

Georgetown University is located at the western extremity of the Georgetown area of the District of Columbia. The majority of the University facilities are located on square 1321, a 94-acre, irregularly shaped area of land bounded on the north by Reservoir Road, on the west by Glover-Archibald Park, on the south by Canal Road and Prospect Street, and on the east by the Convent of the Visitation, and by 37th and P Streets.[1] In addition, the University has classrooms, offices, dormitories and other similar uses located on four smaller blocks (squares 1222, 1223, 1226 and 1248) immediately to the east of 37th Street. The University owns over 90% of the four-block area. Thirty-seven percent of these blocks consist of lots with row houses devoted to residential uses, including nine lots of private, non-university ownership.

The area in which the University is situated is zoned R–3, which is intended to preserve a family-life environment. Present University uses exist in this zoned district as a matter of right or as nonconforming or special exception uses. To employ additional property for campus purposes, the University must obtain a special exception from the BZA. To qualify for a special exception, the University, like other colleges or universities, must meet three conditions set forth in Zoning Regulation § 3101.46: (1) that the proposed university use "is not likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions" (§ 3101.46(a)); (2) that the proposed use does not constitute an "unreasonable campus expansion into improved low-density *districts*" (§ 3101.46(b)) (emphasis in original); and (3) that the college or university submit a campus development plan to the BZA which sets forth the proposed improvements and their uses (§ 3101.-46(c)). The BZA has required approval of the campus plan as a condition precedent to consideration of college or university applications for special exceptions. If granted, a

1. A detailed map of the Georgetown area is included as an Appendix to this opinion.

special exception permits the educational institution to develop property located within its campus boundaries without regard to the normal bulk restrictions applicable in low-density zoning districts (though a higher maximum bulk limit is imposed).

In 1977, the University submitted a campus development plan to the BZA for approval. The plan included specific plans for campus development from 1977 to 1982 and general plans for the post-1982 period. The 1977–1982 phase of the plan contained a proposal for the establishment of campus boundaries. The only boundary here in dispute is the eastern, which would include within the campus four blocks located east of 37th Street. In addition, this phase designated five buildings to be constructed on the university campus, including a student dormitory to be located on one of the blocks east of 37th Street (square 1226). The plan also contemplated an increase in total University population of 301 (from 13,454 to 13,755) over the five-year period. The post-1982 phase of the plan is not relevant to this case.

The BZA held public hearings on the Georgetown University campus plan and received evidence from both proponents and opponents. Relevant to this opinion are the proceedings regarding the proposed eastern campus boundary and the impact of the proposed developments on traffic in the Georgetown area. In support of the eastern boundary line, the University introduced evidence revealing that a campus boundary had never been approved by the BZA. To show the reasonableness of adopting its suggestion to include the four eastern blocks within its eastern campus boundary, the University introduced evidence regarding the many University uses in the four-block area, the University's ownership of over 90% of the four squares and the University's inclusion of the four blocks in

its plans for campus development. A representative of the National Capital Planning Council (NCPC) testified that in 1966 the NCPC approved the campus plan, that in 1973 it reaffirmed this approval, and that it had no reason to modify its prior positions. The Municipal Planning Office (MPO)[2] filed a report approving the proposed campus plan but withheld approval of the dormitory development east of 37th Street pending further study.

In support of its position that the plan would not create objectionable traffic conditions, the University presented its vice president in charge of planning, who testified concerning the University's efforts to reduce traffic congestion generated by the University. He described the steps taken by the University to encourage students not to drive their cars to campus. He noted that the University programs instituted in 1973 had reduced the total number of vehicular trips to the campus by 1500 per day and had lowered the number of University-related personnel seeking parking by 1000 per weekday. The District of Columbia Department of Transportation (DCDOT) reported that the developments proposed in the campus plan for the 1977–1982 period would not appreciably change the University's impact on traffic in the area. It also concluded that the "innovative steps taken by the University to reduce traffic on streets within the residential areas of Georgetown will decrease the demand for automobile usage." It also recognized, however, that "there exists a transportation problem in the Georgetown area which is due, in part, to the traffic and parking generated by the University" and recommended that BZA action on the campus plan be postponed until the results of a DCDOT–Metropolitan Washington Council of Governments' (COG) study of traffic in the Georgetown area be completed.[3]

---

2. The BZA is required to submit applications for special exceptions to the Municipal Planning Office and the District of Columbia Department of Transportation for review and report before taking final action on the application. Zoning Regulations § 3101.46(e).

3. One might legitimately wonder at the proliferation of governmental agencies involved in cases of this kind. The local government seems to be following the example of the national government in the 1930's and 1940's with its array of agencies necessitating use of initials for some degree of brevity.

Opponents, including petitioners and residents of the residential Georgetown area, claimed that the proposed eastern boundary of the campus constituted "unreasonable campus expansion" in violation of § 3101.-46(b). Petitioners argued that due to the availability of land on square 1321, there was no need for the University to expand beyond that square to develop its proposed improvements. Therefore, absent a compelling need to do so, granting permission to the University to acquire the four squares east of 37th Street would be to allow unreasonable campus expansion.

Petitioners and several residents of the Georgetown area also testified as to the existing traffic problems in the University area. They contended that the University was responsible in large part for this congestion. By allowing the University to increase its uses in the area, they claimed, more deplorable traffic problems would inevitably result. Consequently, petitioners contended that the evidence of objectionable traffic conditions warranted a rejection of the University's proposed campus plan or, in the alternative, a conditional approval, contingent upon the University's alleviation of the existing objectionable traffic conditions.

After hearing the extensive evidence, the BZA conditionally approved the 1977–1982 phase of the campus plan. The Board concluded, *inter alia*, that "the continuation of the University's use [within] the [proposed eastern] boundary does not represent an unreasonable expansion into a residential neighborhood," and that the campus plan would "not have an adverse effect because of traffic and will not create dangerous or otherwise objectionable traffic effects." Two of the six conditions upon which the approval was granted require the University (1) to apply for and to justify by sufficient evidence a special exception for each development described in the campus plan, and (2) to continue its remedial traffic and parking measures to further limit the im-

pact of University traffic and parking on the area.

■ Seeking reversal of the BZA order approving the plan, petitioners contend that the BZA abused its discretion by basing its approval on findings of fact which are unreflective of the evidence in the record. Petitioners' first argument in support of this contention is that the evidence shows that the plan provided for unreasonable campus expansion in violation of § 3101.46(b). The evidence referred to by petitioners is the uncontroverted fact that square 1321 contains more than sufficient land to accommodate the University's proposed developments for 1977–1982. While an adequate amount of land exists on square 1321, petitioners argue, the approval of the campus plan permitting development of additional land constitutes an endorsement of unreasonable campus expansion.[4] We are of the opinion, however, that no error is manifest in the BZA's holding that no unreasonable campus expansion results from approval of the campus plan. The term "campus expansion" denotes enlargement of the campus boundaries. The record reveals that at the time of the hearing, a campus boundary had never been designated, at least for zoning purposes. If the University had no campus boundaries at the time of the hearing, then the BZA's designation of the campus boundaries cannot accurately be characterized as an endorsement of campus expansion—either reasonable or unreasonable. The claim that a campus has been expanded by identifying for the first time the campus boundaries for zoning purposes is unpersuasive. In deciding what area of land constituted the campus, the BZA neither enlarged nor expanded the campus in violation of § 3101.46.

■ Petitioners also argue that the Board's findings of fact supporting its conclusion to include the eastern blocks as part

---

4. While we question the underlying assumption in this argument that land owned by a university must be developed to its bulk capacity before any expansion should be permitted, we need not address that issue in this case.

of the campus are not relevant to a determination of the location of campus boundaries. Petitioners challenge the relevancy of the BZA's reliance on such factors as: (1) ownership of the property; (2) the length of that ownership; (3) the existence of University uses on the property; (4) the number of years which these uses have existed; (5) and the reliance by the University (the owner of the majority of the land located in the eastern blocks) on the proposed boundary in its development plans. The BZA's conclusion regarding the campus boundary issue reads as follows:

On the matter of the campus boundaries, the record clearly reflects that the property which the University is requesting to be included in its boundary, including the property east of 37th Street, has been owned by the University *and* used for University purposes for many years. In addition, the proposed boundary has been used by the University for planning purposes for many years, and the proposed boundary approved by the National Capital Planning Commission and recommended for approval by the Municipal Planning Office, the two planning bodies which have reviewed the application. The Board therefore concludes that the continuation of the University's use of the boundary does not represent an unreasonable expansion into a residential neighborhood. [Emphasis in original.]

The issue raised by petitioner, in essence, is what factors should be considered in deciding where to place the boundaries of a university's campus. Aside from the exception discussed below, we can imagine no more pertinent elements than those relied upon by the BZA in arriving at a decision as to where to place the campus boundaries.[5]

The BZA's conclusion regarding campus boundaries was based in part on the finding of fact (No. 11) that the MPO had recommended approval of the proposed boundaries. Petitioners claim that this finding of fact is plainly erroneous. We agree. The record is quite clear that while the MPO approved the campus plan, it made *no recommendation regarding* campus boundaries. We conclude, therefore, that the BZA's finding of fact No. 11 is erroneous.

In reaching this conclusion, we do not hold that the BZA's campus boundary ruling, which is otherwise supported, is necessarily erroneous. The BZA relied on a number of valid factors which might well sustain its conclusion. Nevertheless, it is not distinctly evident that the same conclusion would have been reached if the BZA had not relied on the erroneous finding of fact. Moreover, since determination of campus boundaries is a matter committed to the discretion of the BZA, this court is not at liberty to say that the BZA conclusion would not be affected by elimination of one of the findings of fact upon which the conclusion was based. *Securities and Exchange Commission v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943). Accordingly, we remand this case, pursuant to D.C.Code 1978 Supp., § 1–1510,[6] for a specific determination by the BZA as to whether its conclusion regarding campus boundaries will stand without consideration of this nonexistent recommendation. *See Michigan Consolidated Gas Co. v. FPC,* 108 U.S.App.D.C. 409, 425, 283 F.2d 204, 220, cert. denied, 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960); *Allentuck v. District of Columbia Minimum Wage and Industrial Safety Board,* D.C.App., 264 A.2d 307, 309–10 (1970).

---

5. The BZA's conclusion that "the continuation of the University's use of the boundary does not represent an unreasonable expansion . . ." underscores the fact that the BZA attempted reasonably to ascertain the proper place to locate the boundary rather than to enlarge the campus.

6. The pertinent part of § 1–1510 provides:
   Upon the filing of a petition for review, the court shall have jurisdiction of the proceeding, and shall have power to affirm, modify, or set aside the order or decision complained of, in whole or in part, and, if need be, to remand the case for further proceedings, as justice may require.

Petitioners next contend that the BZA's conclusion regarding the impact of the campus plan on traffic in the Georgetown area is not in line with the weight of the evidence and, consequently, constitutes an abuse of discretion. We do not agree.

■■ The applicable standard of review for BZA cases is aptly set forth in *Stewart v. BZA,* D.C.App., 305 A.2d 516 (1973):

Our review is of course limited to a determination 'whether the decision reached ·. . . follows as a matter of law from the facts stated as its basis, and also whether the facts so stated have any substantial support in the evidence.' . . In short, if the Board's decision follows from its findings and these findings are supported by substantial evidence, we must affirm even though we might have reached another result. [*Id.* at 518, quoting from *Saginaw Broadcasting Co. v. F.C.C.,* 68 App.D.C. 282, 287, 96 F.2d 554, 559 (1938) (citations and footnotes omitted).]

The BZA's conclusion regarding the impact on traffic of the campus plan reads as follows:

[T]he plan proposed for the period up to 1982 does not represent a substantial intensification of the University's operations, and will not result in any worsening of present conditions. In fact, due to a number of factors, including the building of more on-campus residence facilities, the increasing availability of Metro, the Georgetown residential permit park-

ing program and national energy policy among others, there may be less traffic congestion and less difficulty in parking in 1982 than there is at present. The Board therefore concludes that the proposed campus plan will not have an adverse effect because of traffic and will not create dangerous or otherwise objectionable traffic effects.

This conclusion is based upon findings of fact which accurately reflect evidence presented by DCDOT, the University's vice president in charge of planning and others at the hearing. The BZA, evidently, deemed this evidence to be most persuasive. Since this determination is based upon substantial evidence in the record and it does not appear to us to be unreasonable, arbitrary or capricious, we affirm the Board's conclusion and dismiss petitioners' claim of abuse of discretion.[7] *Stewart v. BZA, supra.*

■ Petitioners' contention that the Board erred in overlooking the traffic congestion which already exists in the Georgetown area is unpersuasive. The BZA's conclusion indicates its sensitivity to existing traffic conditions in Georgetown. The University's participation in programs designed to reduce University-related traffic in the Georgetown area was noted in the BZA's findings of fact. Continuation by the University in these efforts was also made a condition of the approval of the campus plan. The success achieved by these programs, as illustrated by the University vice president's testimony that both the number

7. Petitioners challenge the second point noted by the BZA regarding the traffic impact of the plan, as an improper ground upon which approval of the plan could have been granted. This portion of the paragraph reads: "a large volume of traffic is also not related at all to the University, being either through traffic or attracted to or generated by some other activity in Georgetown." Petitioners' claim is based on this court's statement in *Citizens Assoc. of Georgetown v. BZA,* D.C.App., 365 A.2d 372, 375 (1976): "It is not sufficient [to satisfy the requirements of § 3101.46(a)] for the Board merely to identify other sources of traffic and noise in addition to that generated by the university presence and uses." Here, however,

the BZA did not merely dismiss petitioners' traffic contention by citing these extra-University sources of traffic as it did in the former case. As explained above, the BZA fully addressed the impact of the campus plan on traffic in the Georgetown area. Therefore, the BZA's reference to the fact that not all traffic in the Georgetown is generated by the University may be deemed to be a recognition of the fact that existing traffic conditions cannot be attributed solely to the University. This recognition exposes the unreasonableness of a request that approval of the plan be conditioned on a showing that the University alleviate the objectionable traffic conditions in the area. *See supra* at 740.

of vehicular trips to the University and the number of University-related personnel seeking parking spaces have been significantly reduced, was also acknowledged in the findings of fact. Furthermore, DCDOT's assessment that the campus plan would not worsen traffic conditions in the area was also received by the Board. Given the assessment that the campus plan will not aggravate present traffic conditions and the University's success in reducing its share of vehicular congestion and its obligation to continue such remedial traffic programs, the BZA's conclusion that the plan will not create objectionable conditions is both reasonable and justifiable. Hence, we cannot agree with petitioners that there has been an abuse of discretion on this point.

It should be realized that the BZA's approval of the campus plan is only an approval of concept insofar as the traffic issue is concerned. The BZA decision is merely a reasonable forecast or prediction that the plan will not cause objectionable conditions. One of the conditions upon which approval of the plan was granted requires the Uni-

versity to submit an application for a special exception for each of the improvements contemplated in the plan. As part of this application, the University must show that the particular use it requests to develop will not open the door to conditions which will become objectionable to neighboring property. Though reasonable, the BZA's findings and conclusions in the instant case concern only the plan in its entirety and carry no controlling precedential weight in subsequent hearings on applications for special exceptions for each proposed development. The actual impact of the proposed University improvements will be the subject of these future hearings.[8]

For the reasons stated above, we affirm the BZA's order in part and remand solely for reconsideration on the campus boundary conclusion.

*Affirmed in part and remanded for further consideration and appropriate disposition thereafter.*

Appendix to follow.

---

8. It would seem that the sequential steps required by the BZA—campus plan approval and then special exceptions—vest in the campus plan decision sufficient attributes of finality to qualify for contested case review under the D.C. Administrative Procedure Act, D.C.Code 1973, § 1–1510. No point is made of this by respondent or intervenors, perhaps because the campus boundary decision is no doubt ripe for review now even though the rest of the BZA's determination approves concepts only.