Steve LEVY, et al., Petitioners,

v.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent.

No. 88–875.

District of Columbia Court of Appeals.

Argued Nov. 7, 1989.
Decided Feb. 21, 1990.

---

James T. Draude, pro se, with whom Steve Levy, Ralph A. Rosenbaum, Richard J. Price, Washington, D.C., and Robert C. Brewster, pro se, were on the brief, for petitioners.

Norman M. Glasgow, with whom C. Francis Murphy and Louis P. Robbins, Washington, D.C., were on the brief, for Intervenor George Washington University.

Charles L. Reischel, Deputy Corporation Counsel, with whom Frederick D. Cooke, Jr., Corporation Counsel, Washington, D.C., at the time, was on the Statement in Lieu of Brief filed on behalf of respondent.

Before ROGERS, Chief Judge, and STEADMAN and FARRELL, Associate Judges.

FARRELL, Associate Judge:

Five individuals residing near George Washington University (GWU or the University) petition for review of an order by respondent District of Columbia Board of Zoning Adjustment (BZA or Board) approving GWU's plan for campus development during the period 1985 to 2000. Petitioners contend that the plan cannot serve as a basis for BZA approval because it omits certain specific information, including the location, height, and bulk of proposed structures. They further assert that the Board's refusal to consider the effects of GWU's proposals to close streets, erect pe-

1. We reject this contention in note 14, *infra.*

destrian bridges between buildings, and build at levels above applicable height restrictions—a refusal predicated on the Board's lack of jurisdiction ultimately to approve these proposals—was clearly erroneous and inconsistent with the zoning regulations. Petitioners also challenge the BZA's deletion of a condition concerning GWU's interim use of off-campus space as contradictory to its findings and unresponsive to issues raised by the Advisory Neighborhood Commission. Finally, petitioners submit that the Board's findings that the development proposal would have no adverse traffic or parking effects are unsupported by substantial evidence. Also pending is intervenor GWU's motion to dismiss the petition on the ground that the BZA order approving the plan is not a final order reviewable by this court.[1]

We uphold as reasonable the BZA's interpretation that zoning regulations governing campus plans do not in all cases require the degree of specificity in building proposals urged by the petitioners. We are compelled to reverse the Board's order, however, because the BZA failed to consider the effects of the development proposals described above, as its regulations require it to do, and because on GWU's motion for reconsideration the Board modified provisions of its order regarding off-campus leased space without articulating reasons for doing so. Accordingly, we remand for further proceedings consistent with this opinion.

## I. Procedural History

The GWU campus comprises approximately 45 acres in urban Northwest Washington. Unlike many universities, its campus is not self-contained or detached, but encompasses property within residential, special purpose, and commercial zoning districts, some of which is not owned by the University. District of Columbia zoning regulations do not permit colleges and universities to locate within residential or special purpose zoning districts as a matter of right. *See Marjorie Webster Junior College v. District of Columbia Bd. of Zoning*

*Adjustment,* 309 A.2d 314, 316 (D.C.1973) (residential districts). Such institutional uses are allowed only by special exception. *See* 11 DCMR § 210 (1987) (residential districts); *id.* § 507 (special purpose districts). The BZA is authorized by statute to "hear and decide, in accordance with the provisions of the regulations adopted by the Zoning Commission, requests for special exceptions." D.C.Code § 5–424(g)(2) (1988). Zoning regulations empower the BZA to grant special exceptions permitting university uses in residential or special purpose districts "where, in the judgment of the Board, those special exceptions will be in harmony with the general purpose and intent of the Zoning Regulations and Maps and will not tend to affect adversely the use of neighboring property...." 11 DCMR § 3108.1. In order to grant a special exception for university use, the BZA must find that the proposed use is not likely to become objectionable to neighboring property because of noise, traffic, number of students or other objectionable conditions, *see id.* §§ 210.2, 507.8, and, in residential districts, that the proposed use will not unreasonably expand the campus into improved low-density districts. *See id.* § 210.3; *Citizens Ass'n of Georgetown v. District of Columbia Bd. of Zoning Adjustment,* 403 A.2d 737, 738 (D.C.1979) *(Georgetown II).*

In addition to applying to the BZA for review and approval of each proposed building or use, however, universities are required to submit for BZA approval a development plan for the campus as a whole. *Georgetown II, supra,* 403 A.2d at 738; 11 DCMR §§ 210.4, 507.3–507.8. Zoning regulations require that the university's campus plan show: "the location, height, and bulk, where appropriate, of all present and proposed improvements, including but not limited to ... [b]uildings and parking and loading facilities," and "a description of all activities conducted or to be conducted on the campus, and of the capacity of all present and proposed campus development." 11 DCMR §§ 210.4, 507.4. As with specific special exceptions, approval of a campus plan is predicated on the BZA's finding that the uses enumerated in the plan are not likely to become objectionable to neighboring property because of noise, traffic, number of students, and other conditions, *Marjorie Webster Junior College, supra,* 309 A.2d at 317; *see also* 11 DCMR §§ 210.2, 507.7,[2] and, in residential districts, that they will not "result in excessive density or unreasonable campus expansion." *See Citizens Ass'n of Georgetown v. District of Columbia Bd. of Zoning Adjustment,* 365 A.2d 372, 374 (D.C.1976) *(Georgetown I).*

### A. The 1970 Plan

In 1970, the BZA approved a campus development plan for GWU identifying four "functional areas": a "core" academic area, a "peripheral" area, a "medical school/hospital area," and a "high-value frontage" area. The 1970 plan proposed construction of ten buildings in these functional areas. It included an "illustrative site plan" depicting the uses, location, heights and bulks, but not design details, of the proposed buildings. The development plan was staged in three phases, reflecting the University's construction priorities.

Since 1970, GWU has built all ten structures proposed in the 1970 plan, plus two more buildings not provided for in that document, known respectively as the Hospital Additions and the Support Building.

---

2. Regulations governing college and university uses in special purpose zoning districts explicitly require that:

> In approving the submitted plan, the Board shall determine that the use is located so that it is not likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions.

11 DCMR § 507.7. In contrast, parallel regulations for residential districts do not expressly establish this as a prerequisite to approval of the plan, but require the BZA to make such a finding before approving any use of residential property for university purposes. *Cf. id.* § 210.2. Nevertheless, in *Marjorie Webster Junior College v. District of Columbia Bd. of Zoning Adjustment, supra,* we noted that approval of a campus plan for a college located in a residential district was "necessarily predicated" on such a finding, citing the counterpart to current § 210.2. 309 A.2d at 317.

Seeking BZA approval to construct the Support Building in a residential neighborhood at 20th and F Streets, N.W., GWU filed an application for "a special exception ... for further processing under [the] approved Campus Plan." The Advisory Neighborhood Commission (ANC 2A)[3] for the area strongly opposed the proposal and, noting that the 1970 plan appeared no longer to comport with GWU's development program, recommended that the BZA require GWU to update and revise its plan to indicate the nature of anticipated development. Although it granted the exception authorizing construction of the new building, the BZA also acknowledged that the 1970 plan was obsolete, and required GWU to prepare and submit a revised campus plan for consideration and approval by the Board.

### B. The 1985 Plan

GWU submitted an application for BZA review and approval of the revised plan covering years 1985 to 2000 (1985 plan) on April 29, 1986. The 1985 plan proposed an increase in the total daily university population from 25,000 to 30,000, including an increase of 2,000 students. Despite this growth, the 1985 plan proposed no increase in off-street parking over the levels specified in the 1970 plan.

GWU proposed adding up to 2.5 million gross square feet of floor space within the campus boundaries established in the 1970 plan. It modified the four land use categories identified in the 1970 plan, establishing five categories: "educational/mixed use," including classrooms, laboratories, student activity facilities, faculty offices, and open space; "residential," including long-term and temporary housing for students, other tenants, fraternities and sororities; "support," including athletic, administrative,

and physical plant facilities; "medical/hospital," including clinic, medical school, medical library and related support uses; and "investment frontage," including University-owned buildings leased out for commercial purposes. While the 1985 plan proposed construction of 15 buildings within the additional space, it did not specify the exact location of each building.[4] It described proposed structures only in terms of an estimated range of square footage they might occupy within certain space allocations associated with each land use category. For each category, GWU identified preferred and/or alternative building sites, but did not specify precisely where within the identified sites it proposed to locate each building. The 1985 plan also proposed closing five public street segments to focus open space within the campus core. It further proposed construction of five pedestrian bridges linking several existing and proposed structures. The plan identified an area near the campus core where the proposed construction will require relief from building height restrictions. It also provided for GWU's continued use of off-campus leased space.

### C. Proceedings Below

The BZA held hearings on GWU's application on September 10 and October 22, 1986. A number of area residents (including the petitioners), as well as ANC 2A, opposed approval of the plan as submitted. Most of the neighbors' objections were set out in reports, resolutions and testimony offered by ANC 2A, which were endorsed and adopted by parties who testified in opposition at the hearing. As required by zoning regulations, 11 DCMR § 210.6, the District of Columbia Office of Planning (OP) and Department of Public Works

---

3. Advisory Neighborhood Commissions are elected bodies empowered to advise the Council, Mayor, executive agencies, boards and commissions of the District of Columbia government "with respect to all proposed matters of District government policy including decisions regarding planning, streets, recreation, social services programs, education, health, safety and sanitation which affect that Commission area." D.C. Code § 1-261(a) (1987). The statute requires that the issues and concerns raised in the rec-

ommendations of the ANC "be given great weight during the deliberations by the governmental agency" and that "those issues shall be discussed in the written rationale for the governmental decision taken." *Id.* § 1-261(d).

4. For the sake of clarity, we reproduce as an appendix following this opinion excerpts from GWU's 1985 campus plan construction proposal.

(DPW) also reviewed the plan and filed written recommendations.

### 1. Advisory Neighborhood Commission Opposition

ANC 2A found any increase in student enrollment objectionable, noting that a shortage of University housing caused housing competition in the Foggy Bottom neighborhood, thus driving out those otherwise able to live and work there. It asserted that GWU's construction plan lacked sufficient detail, making it impossible to assess the impact of overall development on the residential district. In the absence of these specifics, ANC 2A recommended imposition of detailed land use and design restrictions to ensure that whatever development occurred would be compatible with the surrounding neighborhood. ANC 2A contended that the proposed street closings would create objectionable traffic and parking effects. It opposed the proposed pedestrian bridges, noting that they would adversely affect neighborhood safety by separating University pedestrians from neighborhood pedestrians, and violate the Comprehensive Plan governing overall development in the city.[5] ANC 2A also opposed the proposed height restriction relief, arguing that GWU had failed to demonstrate any need for height increases. It further asserted that continued University use of off-campus leased space within ANC 2A constituted a *de facto* expansion of the campus boundaries.

### 2. Office of Planning Recommendations

OP recommended approval of the plan subject to conditions. It expressed concern that the general nature of GWU's proposed construction plan did not adequately indicate the order in which projects would be built, and recommended that GWU submit a list of development priorities. A list subsequently submitted failed to address OP's concerns, and OP ultimately recommended that GWU be required to notify OP and ANC 2A of specific building proposals after it obtained internal University approval for funding and siting, but before detailed design and specifications became available. Acknowledging that the Council and DPW—not the BZA—had authority to approve street closings,[6] OP supported proposals to close certain streets but disapproved others. It further recommended that GWU replace with existing University parking all on-street parking spaces eliminated by street closings. OP categorically opposed the proposals for pedestrian bridges, finding them inconsistent with the Comprehensive Plan, and that they would obstruct natural vistas along streets contemplated by the L'Enfant city design plan.[7] With the proviso that the affected area be scaled back, OP supported GWU's proposals for height restriction relief, noting that the proposed increases focused campus development where it belonged—in the campus core—and that, because the Zoning Commission would have to approve the height increases as part of a Planned Unit Development (PUD)[8] application, the

---

5. The Comprehensive Plan is a statement of general policy governing planning and development in the District of Columbia. The National Capital Planning Commission is charged with preparing the Plan. D.C.Code § 1–2003 (1987). The District of Columbia Comprehensive Plan of 1984 was adopted by the Council as titles I through X of D.C.Law 5–76, and is reprinted at 10 DCMR §§ 100–1099 (1989).

6. *See* notes 15, 18, *infra.*

7. The L'Enfant Plan is defined as "the body of designs and plans for the original city of Washington which were promulgated by President George Washington and recognized by Congress as the general work of Pierre Charles L'Enfant, notably as subsequently laid out by the Office of the Surveyor of the District government according to the 'King Plats of the City of Washington

in the District of Columbia, 1803'." 10 DCMR § 199.

8. The Planned Unit Development (PUD) process is designed to "encourage diversification in the use, size, type, design, and location of buildings and other structures," 11 DCMR § 2400.4, and to "provid[e] for greater flexibility in planning and design than may be possible under conventional zoning procedures...." *Id.* § 2400.5. The zoning regulations governing PUD approval authorize the Zoning Commission "to approve incentives, *including increases in building heights and densities,* to promote flexibility of development." *Id.* § 2400.6 (emphasis added). For a discussion of the three-stage PUD application review process, see *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n,* 426 A.2d 327, 331 (D.C.1981).

proposal's compatibility with surrounding uses would be thoroughly assessed in the future. With regard to interim leased space, OP recommended that GWU be allowed to continue leasing space, but that all such leasing be restricted to off-campus commercial zones.

### 3. Department of Public Works Recommendations

DPW declined to endorse the street closing and the pedestrian bridge proposals, preferring to defer evaluation of them until GWU filed the necessary applications before appropriate agencies authorized to approve such uses. It did recommend, however, that GWU be required to submit detailed feasibility studies with each application. DPW supported the University's proposal to maintain parking capacity designated in the 1970 plan, finding 2,700 to 3,000 spaces reasonable in light of increased use of public transportation and GWU's implementation of traffic mitigation measures.

### D. The BZA Order

On February 25, 1988, the BZA entered an order approving the plan, subject to eighteen conditions. The Board found the proposed student population increase reasonable, but imposed a condition limiting enrollment to the level specified in the plan. It concurred with GWU's assertion that the plan would not cause objectionable traffic effects, and that the proposed 2,700 to 3,000 parking spaces were adequate, but required GWU to submit a management plan to minimize traffic and parking impacts caused by attendance of special events by non-University affiliated persons. While it found persuasive the University's need for flexibility, the Board concurred with OP's assessment that GWU needed to provide further details in its description of proposed development, and endorsed OP's recommended "early warning" proposal. Accordingly, the BZA imposed a condition requiring GWU to apprise OP and ANC 2A of development plans for specific sites prior to completion of detailed plans and specifications "once locational, programmatic and

financing constraints are resolved internally within the University."

While it declined to adopt the detailed complex of design restrictions proposed by ANC 2A, the BZA required GWU to submit a special exception application for each proposed structure or addition to an existing structure, which, in addition to compliance with zoning regulations and consistency with the 1985 plan, had to demonstrate that the use, height, and bulk of the proposed structure was "sensitive to and compatible with adjacent and nearby non-University owned structures and uses." In addition, the BZA required GWU to incorporate into its development plan siting and design policies to ensure compatibility with and to prevent adverse effects on nearby residential neighborhoods.

With regard to the street closing, pedestrian bridges and height restriction relief proposals, the BZA "decline[d] to comment on the merits of these issues" because it lacked jurisdiction to approve such uses. The Board noted that in each case GWU was required to submit detailed applications for evaluation and review by other District authorities, and that these procedures afforded "ample opportunity for citizen review and comment." The BZA refused, however, to delete the proposals from the approved plan, finding their inclusion mandated by zoning regulations which required that campus plans contain "information on height of buildings, street improvements and all improvements in general." The BZA took pains to note that its approval of the plan incorporating these proposals was not to be construed as an endorsement of them.

Regarding continued University use of leased space, the BZA rejected OP's recommendation that *all* interim leased space be located in commercial districts, but did require that interim office and administrative leased space be so located. Recognizing that GWU's need for interim leased space would fluctuate as development evolved, the BZA further required that GWU identify interim leased space needs as part of each special exception application for specific uses or buildings. Subject to these

and other conditions, the BZA concluded that proposed development was not likely to become objectionable to neighboring property due to increased traffic, noise, number of students or other objectionable conditions, and that the plan complied with zoning regulations.

GWU filed a timely motion for reconsideration challenging, *inter alia*, the condition restricting use of leased space. GWU argued that, because a number of its current off-campus interim uses existed as a matter of right in non-commercial districts, the conditions imposed a restriction prohibited by the zoning regulations. The Board entered a modified order on June 29, 1988, deleting the leased space condition without analysis.

## II. *Legal Discussion*

■ Before treating the issues raised by petitioners, we summarize the standards that guide our review. On review of a BZA decision, we must determine: (1) whether the agency has made a finding of fact on each material contested issue of fact; (2) whether substantial evidence of record supports each finding; and (3) whether conclusions legally sufficient to support the decision flow rationally from the findings. *See* D.C.Code § 1–1509(e); *Foxhall Community Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 524 A.2d 759, 761 (D.C.1987); *George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment*, 429 A.2d 1342, 1345 (D.C.1981); *Citizens Ass'n of Georgetown v. District of Columbia Zoning Commission*, 402 A.2d 36, 41–42 (D.C.1979). Generalized, conclusory or incomplete findings are insufficient; subsidiary findings of basic fact on all material issues must support the end result in a discernible manner. *Dietrich v. District of Columbia Bd. of Zoning Adjustment*, 293 A.2d 470, 473 (D.C.1972), *aff'd on remand*, 320 A.2d 282 (D.C.1974). If the agency makes no finding of fact on a material contested issue, this court on review may not "fill the gap by making its own determinations from the record," but must remand the case. *Nursing Servs., Inc. v. District of Columbia Dep't of Employ-*

*ment Servs.*, 512 A.2d 301, 303 (D.C.1986), *quoting Colton v. District of Columbia Dep't of Employment Servs.*, 484 A.2d 550, 552 (D.C.1984). When the BZA's decision turns on its interpretation of a regulation that agency is charged with implementing, that interpretation must be upheld unless it is "plainly erroneous or inconsistent with the regulation." *George Washington Univ., supra*, 429 A.2d at 1348, *quoting Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965). *See also Dietrich, supra*, 320 A.2d at 286.

■ Issues raised before the BZA by an ANC are accorded special status. The BZA is required by the D.C.Code and its own organic regulations to give issues and concerns raised by the ANC "great weight," and to discuss those issues "in the written rationale for the governmental decision taken." D.C.Code § 1–261(d); 11 DCMR § 3307.2. The "great weight" requirement obliges the agency to "elaborate, with precision, its response to the ANC issues and concerns," and to "articulate why the particular ANC itself, given its vantage point, does—or does not—offer persuasive advice under the circumstances." *Wheeler v. District of Columbia Bd. of Zoning Adjustment*, 395 A.2d 85, 89 (D.C.1978), *quoting Kopff v. District of Columbia Alcohol Beverage Control Bd.*, 381 A.2d 1372, 1384 (D.C.1977). While the agency is not required to defer to the ANC's views, *see Committee for Washington's Riverfront Parks v. Thompson*, 451 A.2d 1177, 1194 (D.C.1982), failure to address ANC concerns with particularity is grounds for a remand even if other procedural requirements are met. *See Bakers' Local Union No. 118 v. District of Columbia Bd. of Zoning Adjustment*, 437 A.2d 176, 180 (D.C.1981).

### A. *Specificity of Building Proposals*

■ Petitioners assert that GWU's campus plan violates zoning regulations by failing to describe proposed buildings with requisite specificity, and that the plan as conditionally approved afforded the BZA insufficient information to evaluate the overall

effect of proposed development on the surrounding neighborhood. We uphold the BZA's findings that GWU's showing was sufficient as a reasonable interpretation of the zoning regulations, and conclude that the information provided was adequate to support the Board's evaluation of the plan.

Petitioners point out that GWU's plan failed to identify specific locations, heights and bulks for the fifteen new buildings. The plan did, however, identify (1) gross square footage of additional space allocated to each of five land use categories, (2) the number of buildings proposed within each category, (3) potential square footage ranges of each building, and (4) preferred and alternative sites for the proposed structures within each use category.[9] GWU explained that the plan did not provide "definitive siting of proposed buildings" and "detailed building envelopes" because of programmatic, funding and land

acquisition[10] constraints. Charles E. Diehl, Vice President and Treasurer of the University, testified on behalf of GWU regarding, *inter alia*, factors affecting the planning process for construction of new university buildings. He noted that the university had nine schools and colleges, and a continuing education program, all competing for limited resources, observing that obtaining consensus on building priorities was a cumbersome and time-consuming process. Once consensus is obtained, and the University has some sense of the nature and cost of a project, it then must obtain approval from the Board of Trustees. Beyond Board approval, Diehl testified to further obstacles in obtaining financing, citing as an example the three years it took GWU to obtain a municipal revenue bond issue to build its Academic Center.[11]

9. As the following explanation and the attached appendix illustrate, the planned locations of the buildings proposed by GWU are not as indeterminate as petitioners suggest. For example, in the educational/mixed use category, GWU proposed to build four buildings. Building A was to occupy between 250,000 and 350,000 gross square feet; Building B, between 150,000 and 200,000; Building C between 100,000 and 150,000; and Building D between 200,000 and 250,000. It proposed four preferred locations for the structures thus identified: a site on Square 56, another on Square 77, another on Square 79 and one on Square 102. Two alternate sites were identified on Squares 101 and 103. Interested parties and the BZA had fair notice that GWU planned to build structures devoted to educational/mixed use purposes on each of the preferred sites, and possibly the alternate sites. The only specificity lacking was whether the building on any given site would occupy a space toward the larger or smaller end of the range of bulks identified for each structure. Moreover, as indicated on the maps attached hereto as an appendix, the identified sites varied in bulk. It is therefore logical to assume that some sites may be too small for the larger structures.

10. The BZA found that GWU does not own approximately 17% of the land within the campus boundaries.

11. Robert E. Dickman, Assistant Treasurer of the University, explained in more detail GWU's need for flexibility, and the reasons for the lack of specificity in the plan:

[P]robably the thing that received perhaps the most discussion was the amount of detail. The impression that I had ... was that there were those that really did feel that to give

definition of the nature they were looking for, that in my opinion we would have to do a schematic design.

Now a schematic design of a building ... requires that you sit down in this process that Mr. Diehl mentioned, you've gone through all the competition on the campus ... you've finally agreed who's going to get a piece of the action on this particular project. Then, further, you sit down with the Chairman and all of the faculty and you decide specifically what programs you are going to teach in there, what class sizes you are going to have, all of those things so that you can define a site plan, because a site plan, after all, has to say this building is going to be so wide and so long; it's going to be so tall.

We do not have that kind of definition at this point in time. Our academic long range planning is in the nature of the goals that are in the Commission for the Year 2000. They perceive our thrust needs to be more research, or thrust needs to be more excellence here, more definition there, more emphasis on international programs.

But until we sit down, which means we really have financing in hand to sit down and get into details, we are just not in a position to generate site specific plans.... Another factor which I had mentioned previously is land ownership. We have ... preferred and alternative building sites, and that, primarily is influenced by the fact that there are some places where we would like to build a building, but we don't own the land.... If an owner doesn't want to sell, he doesn't have to, so we have to have the ability to go to some other location.

While the BZA found persuasive GWU's need for flexibility, it also agreed "that the University needs to augment its description of proposed development." In approving the 1985 plan, the BZA imposed the condition that GWU notify OP and ANC 2A of development plans for specific sites after internal University approval had been secured but before detailed plans and specifications were completed. Presumably, this "early warning" would give these entities an advanced opportunity to evaluate proposed development in preparation for participation in proceedings on GWU's special exception applications for specific buildings or uses.

■ Petitioners contend that, despite these provisions, the plan's omission of specific locations, heights, and bulks for each proposed building violated the regulations governing campus plans. We are unpersuaded. Although the regulations express a clear preference for such detailed information, they require only that the plan show "the location, height, and bulk, *where appropriate,* of all ... proposed improvements." 11 DCMR §§ 210.4, 507.4. The BZA concluded that GWU made the requisite showing by submitting a campus plan that, subject to the notice condition described above, complied with sections 210.4 and 507.4. The Board found convincing GWU's need for flexibility within the constraints identified in the plan. It rejected ANC 2A's recommendations that the Board deny the application or impose rigid and detailed design and land use restraints on GWU as a condition of approval, opting instead for the "early warning" mechanism to address concerns over lack of specificity. As recited earlier, we must uphold the BZA's interpretation of the campus plan regulations unless that interpretation is plainly erroneous or inconsistent with the regulations. *George Washington Univ., supra,* 429 A.2d at 1348 (citations omitted). In light of the "where appropriate" language modifying the requirement of infor-

mation concerning location, height, and bulk, we cannot say that the BZA's conclusion that GWU's plan complied with the regulation was clearly erroneous.[12]

Petitioners oppose this conclusion by arguing that the lack of specificity prevented meaningful evaluation of the impact of overall university development on the surrounding residential district; the identification of multiple potential sites and floor area ranges for many of the buildings, they claim, made review effectively impossible. Yet, although the plan indicated that actual development might take the form of any of several combinations of sites and floor area configurations, it placed all of these possibilities before the Board, thus enabling the agency to evaluate the aggregate impact of each potential combination on the surrounding neighborhood. As OP commented with regard to the adequacy of GWU's information:

> Generally, OP believes the commitment made by the University to generalized land use categories and priority sites provides a reasonably clear indication of what the University intends to build and where. Further, although admittedly not tied to specific sites, the plan provides some sense of future building bulk.

Petitioners further assert that, in adopting OP's proposal to require GWU to provide "early warning" to OP and ANC 2A of specific development plans, the BZA abdicated its duty to assess the overall impact of the development plan in favor of later building-by-building evaluations. While flexible, however, the plan as approved established distinct limitations within which all future construction must occur (absent plan amendment), and in that sense imposed requirements independent of the building-by-building review expected to occur later. The Board's order makes clear that it intends to evaluate future special exception applications for specific uses or

---

12. Petitioners offer a different explanation of the "where appropriate" language. They contend that the phrase recognizes that certain uses or improvements, such as streets, athletic facilities, and parking lots, may not have height and

bulk characteristics. While certainly plausible, this is obviously not the manner in which the BZA interpreted the regulation, and it is the agency, not the petitioner, to whom we owe deference in this regard.

structures for compliance with the plan. This intention, and the imposition of specific conditions meant to regulate future development, *see* note 14, *infra; Georgetown I, supra,* 365 A.2d at 376 n. 7, demonstrate that the Board considered the overall effect of proposed campus development in approving the plan.

Although we find the Board's interpretation permitting a "flexible" development plan reasonable, we add a cautionary note. While submission of generalized information instead of detailed location, height and bulk data may suffice when the university cannot determine its specific needs with precision, it does not follow that approval of the campus plan—and the conditions attending that approval—are of no consequence in the BZA's evaluation of subsequent special exception applications. It would surely contravene the regulatory scheme for the BZA to approve a building plan, even one with broad outlines, but then grant future special exception applications for specific buildings inconsistent with the plan. Dictum in our decision in *Georgetown II, supra,* can be read to say that approval of "concepts" in a campus plan has no binding precedential effect on future special exception applications.[13] Read in context, however, this passage suggests no more than that the BZA's findings that proposed improvements will have no objectionable effects do not prevent the Board from reaching a contrary conclusion after a subsequent hearing on a special exception application for a specific improvement. To the extent that GWU's approved plan *restricts* uses, sizes, and potential lo-

cations of proposed buildings, its effect on subsequent proceedings is quite different. Specifications of what GWU proposes to build, where it plans to place those improvements, how large the structures will be, and the uses to which they will be put represent concrete restraints on future development. As mentioned earlier, the BZA approved the plan with the proviso that GWU demonstrate that any subsequent specific improvements are consistent with the plan. Consequently, GWU may not make improvements inconsistent with the plan unless it obtains BZA approval of an amendment to the plan. *See Draude v. District of Columbia Bd. of Zoning Adjustment,* 527 A.2d 1242, 1255 n. 6 (D.C. 1987) (acknowledging that GWU's approved campus plan "restrain[s] placement of a given building ... much like other zoning restrictions placed on the university"); *Georgetown I, supra,* 365 A.2d at 376 n. 7 (conditions should be enforced if the applicant takes advantage of the benefits of approval) (citation omitted).

■■■ In light of the independent and binding significance of plan approval, therefore, petitioners' assertion that the BZA "abandoned any effort at overall evaluation" lacks merit. We conclude that GWU's showing adequately served the functional purpose of the regulations, and that the BZA's interpretation that the regulations did not require GWU to identify the precise location, height and bulk of each proposed building was reasonable under the circumstances.[14]

13. In *Georgetown II,* we upheld as reasonable the BZA's finding that Georgetown University's campus plan would not create objectionable traffic conditions, but noted:

It should be realized that the BZA's approval of the campus plan is only an approval of concept *insofar as the traffic issue is concerned.* The BZA decision is merely a reasonable forecast or prediction that the plan will not cause objectionable conditions. One of the conditions upon which approval of the plan was granted requires the University to submit an application for a special exception for each of the improvements contemplated in the plan. As part of this application, the University must show that the particular use

it requests to develop will not open the door to conditions which will become objectionable to neighboring property. Though reasonable, the BZA's findings and conclusions *in the instant case* concern only the plan in its entirety and carry no controlling precedential weight in subsequent hearings on applications for special exceptions for each proposed development. The actual impact of the proposed University improvements will be the subject of these future hearings.
403 A.2d at 743 (emphasis added).

14. For reasons similar to those just discussed, we reject GWU's contention that the BZA order lacks sufficient attributes of finality to permit review by this court. The District of Columbia

## B. Street Closing, Pedestrian Bridge, and Height Restriction Proposals

 The BZA lacks jurisdiction to approve the particular street closings, pedestrian bridges and height restriction relief proposals in GWU's plan.[15] For this reason, the BZA "declined to comment on the merits of these issues," explaining:

The Board notes that before any specific action can be taken with regard to any of these three proposals, the University must submit an individual, detailed, application to the appropriate District authority for review and decision. In all instances, be it a PUD and map amendment application to the Zoning Commission for permission to construct a University building in excess of prevailing height requirements; or an application to the Council to close a campus street; or an application to the Zoning Commission under the Air Rights Act to construct a pedestrian bridge, existing procedures provide ample opportunity for citizen review and comment.

We conclude that the BZA mistook its lack of authority to approve the proposals

---

Administrative Procedure Act vests this court with jurisdiction to entertain appeals from "[a]ny person suffering a legal wrong, or adversely affected or aggrieved, by an order or decision of ... an agency in a contested case...." D.C.Code § 1–1510(a) (1987). The Act defines a reviewable "order" as "the whole or any part of the *final* disposition...." *Id.* § 1–1502(11) (emphasis added). To be considered final, and to trigger a right of appellate review, an order in a contested case must "impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process." *Potomac Elec. Power Co. v. Pub. Serv. Comm'n,* 455 A.2d 374, 377–78 (D.C.1982); *Washington Urban League v. Pub. Serv. Comm'n,* 295 A.2d 906, 908 (D.C.1972), quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948).

The BZA's order clearly "fixes legal relationships" as the consummation of the plan approval process. As already explained, the order makes clear that *all* future applications for special exceptions must be measured for their consistency with the 1985 plan, regardless of whether they are in special purpose districts—where existing regulations explicitly require such an inquiry—or in residential zoning districts, where they do not. *Compare* 11 DCMR § 507.8 *with id.* § 210. Further, some conditions ensure continued residential use of property within proposed campus boundaries, and address concerns of insufficient dormitory space to accommodate the proposed increase in student population. The BZA removed Square 43, where private residential uses predominated, from the boundaries delineated in the campus plan; it also required that GWU limit its use of the Scheneley Apartments, West End Apartments, and President Condominiums to dormitory purposes if it was successful in acquiring those properties. Recognizing that unavailability of those buildings would, in essence, relieve GWU of "any obligation under the Plan to construct on-campus housing," the BZA further required GWU to designate at least one University-owned site within the campus boundaries dedicated to residential use as a preferred development site, and another as an alternate. To prevent objectionable effects from excessive numbers, the BZA imposed a cap on student, faculty, and staff populations. It further required that all subsequent applications for special exceptions show that "the use, height, bulk and design of any proposed structure or addition to an existing structure are sensitive to and compatible with adjacent and nearby non-University structures and uses...."

A finding by the BZA that GWU failed to comply with any of the conditions of the order could well result in summary denial of a future application for a special exception permitting a specific use, unless GWU secured an amendment to the plan. The order approving the 1985 plan thus meets the definition of a final order. *See, e.g., Georgetown II, supra,* 403 A.2d at 743 n. 8 (approval of campus plan establishing campus boundaries reviewable as final order).

15. Street closings must be approved by the District of Columbia Council, in accordance with the Street and Alley Closing and Acquisition Procedures Act of 1983. D.C.Code § 7–421 to –435 (1989). *See also* note 18, *infra.* The Comprehensive Plan, *see* note 5, *supra,* disfavors pedestrian bridges: "The policies established in support of the street orientation and design objectives are as follows ... [p]rohibit second-level pedestrian bridges that drain activity from the street level and compromise the visual integrity of the street plan." 10 DCMR § 909.2(f). The area above streets and alleys is defined as "airspace." D.C.Code § 7–1031. Airspace is a public resource, but the Mayor, in conformity with the Comprehensive Plan, may enter into leases for its use, after Zoning Commission approval. *Id.* §§ 7–1032, –1034. Finally, GWU's proposed height increases would require approval from the Zoning Commission as a Planned Unit Development (PUD). *See* 11 DCMR §§ 2400 to –2408. *See also Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n, supra* note 8, 426 A.2d at 331; note 8, *supra.*

for a lack of jurisdiction to assess the impact of the proposals on the surrounding neighborhood in its review of the campus plan. We are not required to defer to an agency's interpretation of its authority if that view is plainly wrong or inconsistent with the regulation, *George Washington Univ., supra,* 429 A.2d at 1348, and here the BZA's interpretation is both incorrect and contrary to the regulatory scheme. Not only did the BZA have authority to assess the impact of these proposals, the regulations affirmatively *required* it to do so.

The essence of the BZA's regulatory mandate in approving a campus plan is to evaluate whether proposed use as a college or university, *as a whole,* is likely to become objectionable to neighboring property because of noise, traffic, number of students and other conditions. *See* 11 DCMR § 507.7; *Draude, supra,* 527 A.2d at 1247–48; *Marjorie Webster Junior College, supra,* 309 A.2d at 316–17. *See also* note 2, *supra.* In abstaining from consideration of such significant and controversial factors as the traffic and parking effects of street closings [16] and the impact on the surrounding neighborhood of height increases, the BZA based its ultimate conclusion—that the plan would not result in objectionable conditions—not on the plan as a whole but on a redacted version. In doing so, it largely ignored the body of evidence adduced in opposition to these proposals. Paradoxically, the Board recognized that the regulations required the plan to contain the proposals it declined to address:

> [W]hile the Board acknowledges it lacks jurisdiction over these concepts, the Board nonetheless finds their incorporation in the Proposed Plan appropriate. Indeed, their inclusion appears mandated by 11 DCMR 210.4 and 507.4. These sub-sections call for submission of a uni-fied campus plan incorporating information on the height of buildings, street improvements, and all improvements in general, which would appear to incorporate improvements like pedestrian bridges.

Inclusion of such information would serve little or no purpose if the zoning regulations did not also require the BZA to consider it in evaluating the plan.

Nothing in the regulations suggests that the BZA's authority to approve—or reject—a campus plan depends on its authority to approve the specific proposals contained therein. Indeed, as indicated in the previous section, even with respect to specific uses requiring special exceptions within the BZA's power to grant, the regulations contemplate a two-stage process, entailing independent inquiries. GWU suggests, however, that recognition of a "two-tier" approval requirement for these proposals is pointless since the agency with ultimate decision-making authority can undo the BZA's approval. GWU misses the point that, in approving the plan, the BZA assesses the aggregate impact of an entire development program, an inquiry different from evaluation of discrete proposed improvements. Emphasizing the independent nature of the inquiries, we noted in *Georgetown II* that approval of the plan represents "a reasonable forecast or prediction that *the plan* will not cause objectionable conditions," but made clear that such a finding does not preclude a contrary result after a hearing on an application for final approval of a specific use. 403 A.2d at 743 (emphasis added); *see supra,* note 13.

Moreover, multiple-agency approval is not inconsistent with the regulatory scheme's two-tier decision-making structure. As this case illustrates, the BZA's misgivings over a specific proposal can lead

---

**16.** Because we conclude that the BZA's failure to consider certain development proposals rendered its ultimate findings and conclusions inadequate in their entirety, we need not address petitioner's assertion that the Board's findings and conclusions concerning traffic and parking were unsupported by substantial evidence. It is sufficient to note that those specific findings and conclusions were deficient because they failed to take into account the effects of proposed street closings.

to its deletion from the plan,[17] or imposition of a condition governing subsequent applications for final approval of an improvement. *See Georgetown I, supra*, 365 A.2d at 376–77 & n. 7. Even though another agency may have jurisdiction to grant approval despite the BZA's objections, the Board's disapproval of a specific proposal in a campus plan can alert the agency with final approval authority to a potential adverse impact which can influence the ultimate decision.[18] Conversely, a finding by the BZA that a proposal (*e.g.*, for a street closing) fits in with a reasonable campus plan may provide valuable insight to the Council or the approving agency.

■ We hold that the Board's failure to consider the effects of proposed street closings, pedestrian bridges and relief from height restrictions rendered its findings inadequate, and legally insufficient to support the ultimate conclusions which underlie approval of the plan. *See Foxhall Community Citizens Ass'n, supra*, 524 A.2d at 761; *George Washington Univ., supra*, 429 A.2d at 1345; *Citizens Ass'n of Georgetown, supra*, 402 A.2d at 41–42. The Board's exclusion of these considerations from its analysis owing to an erroneous interpretation of its jurisdiction left unaddressed material issues contested by the ANC 2A and other neighborhood residents. Accordingly, we remand, *see Nursing Servs., supra*, 512 A.2d at 303, so that the Board may enter findings and conclusions after evaluation of the effect of the *entire* campus plan—including the street closing, pedestrian bridge, and height restriction relief proposals—on traffic, noise and other conditions specified in the regulations.

### C. The Leased Space Condition

■ Petitioners contend that the BZA failed to address an issue raised by ANC 2A as required by statute in deleting without explanation a condition requiring GWU to locate off-campus interim space leased for office and administrative purposes in commercial districts. In addition, they submit that because the BZA left a finding recognizing the need for the condition undisturbed after deleting the condition, the order is self-contradictory. We conclude that the agency failed to meet a material issue raised by the ANC by explaining its reasons for deleting the condition. Given the conflict between the factual findings and the BZA's conclusions, the deletion of the condition does not flow rationally from the facts established in the order. Moreover, the absence of analysis makes it impossible to determine whether the BZA based its action on correct legal principles.

GWU currently leases 224,726 square feet of space, a majority of which is located outside the campus boundary within ANC 2A's borders.[19] The ANC opposed continued use of off-campus space except for short-term uses to accommodate dislocations caused by renovation or construction projects, arguing that "GWU's use of substantial amounts of off-campus space in ANC 2A represents a de facto expansion of its boundaries and spreads the adverse impacts of the university beyond the campus boundaries."[20]

---

17. For example, here the BZA deleted all of Square 43 and a parcel containing the Concordia Church from the approved campus plan boundaries, after both ANC 2A and OP had expressed opposition to continued inclusion.

18. For example, although the BZA has no power to approve a street closing, the applicable statute provides for submission of agency views to the District of Columbia Council, D.C.Code § 7–422(2), and authorizes the Council to impose conditions to address those concerns. *Id.* § 7–429(a)(3).

19. The BZA may permit a university to use land located in a residential district beyond the designated borders of the campus provided: (1) the use is on an interim basis; (2) the BZA determines the use to be a "proper university function"; (3) the site is "within a reasonable distance of the ... campus"; and (4) the BZA determines that the use is not likely to become objectionable to neighboring property. 11 DCMR § 210.5.

20. In addition to the limitation to interim uses to offset construction displacement, ANC 2A recommended that GWU be required to vacate off-campus leased space in ANC 2A within five years.

The BZA's order addressed the leased space issue as follows:

> While the University seeks the widest possible latitude in its use of interim, leased space, the Board finds interim *office and administrative* leased space rightfully belongs in commercial districts. The Board acknowledges a condition to this effect is less restrictive than sought by ANC 2A and OP. However, to compel the University to seek leased *residential* space in commercial districts, an intended effect of OP's recommended condition, places the University at an economic disadvantage. Further the Board finds excluding all University interim leased space from the boundaries of ANC 2A inefficient in that it removes University leased space from physical proximity to the campus.... (emphasis added).

In accordance with this finding, the BZA imposed a condition requiring that "[a]ll off-campus short-term office and administrative interim leased space shall be located in commercial zones" (Condition 15). GWU filed a motion for reconsideration, arguing that the Board acted *ultra vires* in setting conditions more restrictive than the zoning regulations impose, pointing out that the "University has a number of off-campus uses which exist as a matter of right in non-commercial districts." A revised BZA order set out a list of modified conditions which omitted former Condition 15. The BZA supplied no further reasoning or analysis beyond a preliminary summary of GWU's basic contention, expressed in general terms. The modified order did not revisit the BZA's earlier findings of fact.

Intervenor GWU argues that the elimination of the condition rendered retention of the supporting finding "of no moment." We disagree. In deleting the condition without withdrawal or explanation of its earlier finding, the BZA essentially left unaddressed ANC 2A's argument in opposition to the motion: that "it is perfectly reasonable for the Board, as a condition for approving substantial expansion within the campus, to require GWU to refrain from placing office and administrative uses in the non-commercial districts outside the campus (even if some such uses might otherwise be permitted under the Zoning Regulations)."

Elimination of the condition without explanation requires reversal on two grounds: (1) the agency reached a conclusion unsupported by subsidiary findings of fact, leaving the record inadequate to reveal the basis for its decision, and (2) the BZA failed to "articulate why the [ANC], given its vantage point, d[id] not offer persuasive advice under the circumstances," *Wheeler, supra,* 395 A.2d at 89 (citation omitted), as required by D.C.Code § 1–261(d). Indeed, the conflict between the order's findings and the modified order's conclusion leaves the record in a state where the agency's action not only does not "rationally flow" from the findings, *cf. Dupont Circle Citizens Ass'n, supra* note 8, 426 A.2d at 334, but is contrary to them.

Intervenors surmise that the deletion of the condition means that the BZA rejected ANC 2A's argument that the condition was reasonable, and struck the condition upon recognizing that the agency lacked power to impose such a condition, as submitted by GWU. On this record we need not reach the merits of whether the condition was beyond the BZA's authority. A court may not supply a rationale for the agency decision by conjecture from what it did. In *Citizens Association of Georgetown, supra,* we said: "[t]he court cannot properly fill the gap itself by inferring findings on a party's objections through an inspection of the record, the agency's other findings, and the ultimate decision." 402 A.2d at 42. Rather, our function is to

> assure that the agency has given full and reasoned consideration to all material facts and issues. The court can only perform that function when the agency discloses the basis of its order by an articulation with reasonable clarity of its reasons for the decision.

*Dietrich, supra,* 293 A.2d at 473. Accordingly, we must remand for an adequate

explanation of the BZA's reasons for deleting the leased space condition which specifically addresses ANC 2A's argument that the condition was reasonable and not *ultra vires*.

### III. Conclusion

Although we find reasonable the BZA's interpretation that GWU was not required by regulation to set forth its building proposals with greater specificity, for the reasons discussed, we are compelled to reverse the agency's order and remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

[See pages 755–759 for Appendix.]

## APPENDIX

Preferred Building Sites

**EDUCATIONAL MIXED USE**—classrooms, laboratories, libraries, student activities, faculty offices, parking, parks and open space, and limited support functions.

| Building Envelope | GSF | Preferred Building Sites * Square Numbers | Alternate Sites |
|---|---|---|---|
| A | 250-350,000 | 56, 77, 79, 102 | 101, 103 |
| B | 150-200,000 | | |
| C | 100-150,000 | | |
| D | 200-250,000 | | |

🗆 Preferred Site

🗆 Alternate Site

Preferred Building Sites or Acquisition Sites

RESIDENTIAL/RESIDENTIAL MIXED USE—housing both temporary and long term for students and other tenants, fraternities and sororities, and other functions described for Educational Mixed Use.

| Building Envelope | GSF | Preferred Building or Acquisition Site * | Alternate Site |
|---|---|---|---|
| E | 100-150,000 | 77 | 75 |

▨ Preferred Site

▨ Alternate Site

APPENDIX—Continued

Preferred Building Sites

SUPPORT/SUPPORT WITH RESIDENTIAL—athletic facilities, administrative offices, physical plant facilities, auxiliary services, parking, limited Educational Mixed Use, and other functions described for Residential.

| Building Envelope | GSF | Preferred Building Sites * Square Numbers | Alternate Sites |
|---|---|---|---|
| F | 75-100,000 | 42, 57, 75, 77, 103 | |
| G | 60- 80,000 | | |
| H | 75-100,000 | | |
| I | 60- 80,000 | | |
| J | 40- 50,000 | | |

▨ Preferred Site

Preferred Building Sites

MEDICAL—hospital, clinics, medical school, medical library, parking and related support functions.

| Building Envelope | GSF | Preferred Building Sites * Square Number | Alternate Sites |
|---|---|---|---|
| K | 230,000 | 39, 40, 54, 75 | |
| L | 50- 60,000 | | |
| M | 400-500,000 | | |
| N | 50- 60,000 | | |

▨ Preferred Site

Preferred Building Site

INVESTMENT FRONTAGE—income-producing properties.

| Building Envelope | GSF | Preferred Building Site * Square Number | Alternate Sites |
|---|---|---|---|
| N | 100-150,000 | 75 | |

▨ Preferred Site